**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

| | |
|---|---|
| In re:<br><br>**AppleILLINOIS L.L.C.,**<br><br>　　　　**Debtor** | **Chapter 11**<br><br>**Case No. 13-20723 (TNW)** |

**EMERGENCY MOTION PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND
364, RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE AND LOCAL BANKRUPTCY RULES 2002-1 AND 4001-1 FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING INCURRENCE BY THE
DEBTOR OF POST-PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER
ALL OTHER SECURED INDEBTEDNESS AND WITH SUPERPRIORITY, (II)
GRANTING LIENS, (III) AUTHORIZING USE OF CASH COLLATERAL BY THE
DEBTOR AND PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING THE
AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**

The above-captioned debtor and debtor-in-possession (collectively the "Debtor") in the

above-captioned cases, by and through its proposed undersigned counsel, hereby moves this

Court for entry of an interim in substantially the form attached hereto as <u>Exhibit A</u> and, subject

to final approval, a final order (the "Interim Order" and, subject to final approval, the "Final

Order"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"),

Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and the Local Rules of this Court: authorizing the Debtor to (i) obtain cash advances and other

extensions of credit on a senior secured, revolving basis, in an initial aggregate principal amount

not to exceed $1,000,000.00 (the "Senior DIP Credit Facility") pursuant to the certain Senior

Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "Senior DIP Credit

Agreement" and together with any and all documents, agreements and instruments delivered

pursuant thereto, or as may be amended form time to time, the "Senior DIP Financing

Agreements")[1] between Debtor and RMH Illinois LLC (the "Senior DIP Lender"); (ii) obtain cash advances and other extensions of credit on a senior superpriority basis, subordinated only to the Senior DIP Credit Facility, on revolving basis, in an initial principal amount of $500,000.00 (the "Subordinated DIP Credit Facility", and together with the Senior DIP Facility, the "DIP Facilities") pursuant to the certain Subordinated Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "Subordinated DIP Credit Agreement", and together with any and all documents, agreements and instruments delivered pursuant thereto, or as may be amended form time to time, the "Subordinated DIP Financing Agreements")[2] between Debtor and Curtis James Investments (the "Subordinated DIP Lender", and together with the Senior DIP Lender, the "DIP Lenders"); (iii) granting security interests and superpriority claims, and (iv) granting adequate protection, pursuant to sections 105, 361, 362, 363, 364(c), (d) and (e) of the Bankruptcy Code, and Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Local Rules 2001-2 and 4001-2 pursuant to the terms and conditions set forth in the attached proposed Interim Order.

## CONCISE STATEMENT OF RELIEF REQUESTED AND SUMMARY OF TERMS OF PROPOSED CREDIT AGREEMENT AS REQUIRED PURSUANT TO BANKRUPTCY RULE 4001(C)(1)(B)

The Debtor seeks entry of an Interim Order substantially in the form attached hereto as Exhibit A, authorizing the Debtor, pursuant to Bankruptcy Code sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), to: (i) obtain cash advances and other extensions of credit on a senior secured, revolving basis, in an initial aggregate principal amount not to exceed $1,000,000.00 from the Senior DIP Lender pursuant to the terms and conditions of the Senior DIP Credit Agreement; (ii) grant security interests and superpriority claims to the

---

[1] A copy of the Senior DIP Credit Agreement is attached as Exhibit B and a copy of the related security agreement (the "Senior DIP Security Agreement") is attached as Exhibit C.

[2] A copy of the Subordinated DIP Credit Agreement is attached as Exhibit D and a copy of the related security agreement (the "Subordinated DIP Security Agreement") is attached as Exhibit E.

Senior DIP Lender, (iii) obtain cash advances and other extensions of credit on a senior secured,

revolving basis, in an initial principal amount of $500,000.00 from the Subordinated DIP Lender

pursuant to the terms and conditions of the Subordinated DIP Credit Agreement; (iv) grant

security interests and superpriority claims to the Subordinated DIP Lender, subordinated only to

the Senior DIP Credit Facility, and (iv) grant adequate protection to the Pre-Petition Lender, (iv)

schedule a final hearing; and (v) grant such further and related relief as the Court deems just and

equitable.

Pursuant to recently enacted Bankruptcy Rule 4001(c)(1)(B), the Debtor sets forth herein

a concise statement of the requested relief and a summary of the key terms of the proposed

Senior DIP Credit Agreement and the Subordinate DIP Credit Agreement, and the locations

within the relevant documents of all material provisions of same.[3]

| Reportable Item | Summary |
|---|---|
| The Borrower<br>*Location in Senior DIP Credit Agreement: Pg. 1*<br>*Location in Subordinated DIP Credit Agreement: Pg. 1*<br>*Location in Order: Pg. 14* | AppleIllinois L.L.C. ("Borrower", "Debtor-in-Possession") |
| The Lenders<br>*Location in Senior DIP Credit Agreement: Pg.1*<br>*Location in Subordinated DIP Credit Agreement: Pg. 1*<br>*Location in Order: Pg. 2, 14* | RMH Illinois LLC  ("Senior DIP Lender")<br><br>Curtis James Investments  ("Subordinated DIP Lender") |
| Borrowing Limit and Availability<br>*Location in Senior DIP Credit Agreement: ¶ Pg. 8, 16 (Section 2.1)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 15, 17 (Section 2.1)*<br>*Location in Order: Pg. 2, 14* | Cash advances and other extensions of credit on a senior secured, revolving basis, in an initial aggregate principal amount not to exceed $1,000,000 (under Senior DIP Credit Facility) with a maximum available amount of $400,000.00 (the "Interim Amount") available during the "Interim Period" all subject to and consistent with the Budget, entry of the Interim Order and Final Order; and, an initial principal amount of $500,000.00 under the |

---

[3] In the event of an inconsistency between the summary of key terms and the Senior DIP Credit Agreement or the Subordinated DIP Credit Agreement (collectively, the "DIP Credit Agreements"), the DIP Credit Agreements shall govern.

| Reportable Item | Summary |
|---|---|
|  | Subordinated DIP Credit Facility with a maximum available amount of $0.00 available during the "Interim Period" all subject to and consistent with the Budget, entry of the Interim Order and Final Order. |
| Use of Proceeds<br>*Location in Senior DIP Credit Agreement: Pg. 24 (Section 3.7), 49-50 (Section 10.3)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 25 (Section 3.7), 49-50 (Section 10.3)*<br>*Location in Order: Pg. 14-15 (¶ 12), 27-29 (¶ 23-25)* | Proceeds of the Senior DIP Credit Facility and Subordinated DIP Credit Facility shall be used solely for the limited purposes of funding the Borrower's general operating expenses, the costs and expenses of the Chapter 11 Case and including all of the fees and costs set forth in Section 10.3 (relating to Expenses of Senior DIP Lender and Subordinated DIP lender, respectively), in accordance with the 13-Week Budget and the Financing Orders. |
| Interest Rate<br>*Location in Senior DIP Credit Agreement: Pg. 5, 17-18 (Section 2.6)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 18 (Section 2.6)*<br>*Location in Order: Pg. N/A* | The Senior DIP Credit Agreement interest rate of 8% with an additional default rate of 2%<br><br>The Subordinated DIP Credit Agreement interest rate of 8% with an additional default rate of 2% |
|  |  |
|  |  |
| Expenses<br>*Location in Senior DIP Credit Agreement: Pg. 49-50 (Section 10.3)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 49-50 (Section 10.3)*<br>*Location in Order: Pg. 44-45 (¶ 47)* | All costs and expenses of the Senior DIP Lender in connection with the Senior DIP Credit Facility, including, without limitation, reasonable legal, accounting, collateral examination, monitoring, and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out-of-pocket expenses will be paid by the Debtor. |
| Term/Maturity Date<br>*Location in Senior DIP Credit Agreement: Pg. 6, 15*<br>*Location in Subordinated DIP Credit Agreement: Pg. 6, 15*<br>*Location in Order: Pg.* | For the both credit facilities, the Stated Maturity Date is June 25, 2013.  The DIP Expiration Date is the earliest of (i) the Sale Closing Date, (ii) the occurrence of an Event of Default, or (iii) the Stated Maturity Date. |
| Events of Default<br>*Location in Senior DIP Credit Agreement: Pg. 42-45 (Article VIII)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 42-46 (Article VIII)*<br>*Location in Order: Pg. 21-23 (¶¶ 20, 21)* | The DIP Credit Agreements contains events of default customarily found in loan agreements of this nature, including without limitation, the following: (i) failure to pay principal of interest of any loan (ii) any representation in obtaining Loan that is materially misleading or false; (iii) Debtor's failure to file agreed upon pleadings with the Court; (iv) the non-entry of certain anticipated orders by date certain milestones (v) breach of certain covenants and conditions in Article VI and sections 5.2, 5.3(a), 5.8; (vi) another default under the DIP Credit Agreements that remain unremedied after ten days; (vii) the creation of a lien or challenge by Debtor jeopardizing the priority lien the DIP lenders (viii) a finding by the Court that any material portion of the DIP Credit Agreements or sale agreements are unenforceable (ix) termination of any sale document; (x) numerous other events that occur in the |

| Reportable Item | Summary |
|---|---|
| | bankruptcy case including the appointment of a trustee, conversion to a chapter 7, entry of order jeopardizing anticipated 363 sale, the reversal, vacation or stay of the effectiveness of either the Interim Order or Final Order arising with respect to this Motion. |
| Liens/Security<br>*Location in Senior DIP Credit Agreement: Pg. 26 (Section 3.14)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 27 (Section 3.14)*<br>*Location in Order: Pg. 33-34 (¶¶ 30, 31)* | All amounts owing by the Borrower under the DIP Credit Agreements will be secured by a first priority perfected priming security interests (Senior DIP Lender has priority over Subordinated DIP Lender) in, and lien on, substantially all of the assets (tangible, intangible, real personal or mixed) of the Borrower, whether now owned or hereinafter acquired, arising, or to become due, or in which that Borrower obtains an interest, and all products, proceeds, substitutions, and accessions of or to substantially all assets of the Borrower, including without limitation, accounts, inventory, equipment, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, including, subject to entry of the Final Order, the proceeds of any avoidance actions arising under chapter 5 of the Bankruptcy Code, (the "<u>Avoidance Actions</u>"), other general intangibles, and all products and proceeds thereof (the "Collateral"),<br><br>Subject to the Carve-Out, the DIP Lenders will be granted  allowed superpriority claims (the "<u>Superpriority Claims</u>") having priority in the Case and any successor case under sections 364(c)(1), 503(b), and 507(b) over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.  The Superpriority Claims of the Senior DIP Lender are senior to those granted to the Subordinated DIP Lender and over all administrative claims.  The Superpriority Claims of the Subordinated DIP Lender are senior over all administrative claims other than those of the Senior DIP Lender. |
| Carve-Out Expenses / Agreed<br><u>Administrative Expense Priorities</u><br>*Location in Senior DIP Credit Agreement: Pg.*<br>*Location in Subordinated DIP Credit Agreement: Pg.*<br>*Location in Order: Pg. 16-17 (¶ 15), 33-34 (¶¶ 30, 31)* | Carve-Out Expenses shall mean sums having priority ahead of the super priority administrative expense claims and liens securing the DIP Credit Facility for (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (ii) accrued and unpaid fees and expenses of attorneys and financial advisors employed by the Debtor and the Committee pursuant to section 327 and 1103 of the Bankruptcy Code, and accrued reasonable expenses of the members of the Committee, in each case to the extent provided for and in amounts not to exceed $75,000.00 during the period from the Petition Date through the date on which an Event of Default first occurs. |
| Borrowing Conditions<br>*Location in Senior DIP Credit Agreement: Pg. 26-30 (Article IV)*<br>*Location in Subordinated DIP Credit* | The Senior DIP Credit Agreement contains certain customary conditions precedent to entry into the DIP Credit Facilities. |

516946v4

| Reportable Item | Summary |
|---|---|
| *Agreement: Pg. 27-30 (Article IV)*<br>*Location in Order: Pg. 14 (¶ 12)* | |
| Business Plan/Budget<br>*Location in Senior DIP Credit Agreement:*<br>*Pg. 2, 30-31 (Section 5.1), 39 (Section 6.9)*<br>*Location in Subordinated DIP Credit*<br>*Agreement: Pg. 3, 31 (Section 5.1), 40*<br>*(Section 6.9),*<br>*Location in Order: Pg. 15 (¶ 12), 27-29*<br>*(¶¶ 23-25),* | The Borrower's 13 week cash flow projections in form and substance satisfactory to the Lender. |
| Adequate Protection of Prepetition Claims<br>*Location in Senior DIP Credit Agreement:*<br>*Pg. 12, 35 (Section 3.10), 36-37 (Section*<br>*6.2), 41 (Section 6.21)*<br>*Location in Subordinated DIP Credit*<br>*Agreement: Pg. 13, 35 (Section 3.10), 35*<br>*(Section 5.10), 37 (Section 6.2), 42 (Section*<br>*6.21)*<br>*Location in Order: Pg. 29-31 (¶¶ 26-27)* | As adequate protection for any diminution in value of the Pre-Petition Collateral, the Pre-Petition Lender shall receive, as adequate protection: (a) Replacement Liens in the Pre-Petition Lender Collateral, junior only to the Senior DIP Liens the Subordinated DIP liens, and the Carve-Out, and (b) Pre-Petition Superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code, junior only to the DIP Liens, DIP Superpriority Claims, and Carve-Out.  No adequate protection payments are to be paid on account of Pre-Petition Liens. |
| The validity, enforceability, priority, or amount of prepetition claims<br>*Location in Senior DIP Credit Agreement:*<br>*generally, Pg.35-37 (Section 6.2)*<br>*Location in Subordinated DIP Credit*<br>*Agreement: generally Pg. 36-37 (Section*<br>*6.2)*<br>*Location in Order: Pg. 10-13 (¶ 10)* | The Borrower stipulates and acknowledges the amount, validity, enforceability, priority and non-avoidability of the claims and liens in respect of the Prepetition Financing Agreements, and waives any and all claims and defenses related to the Pre-Petition Lender, and its employees, advisors, attorneys, agents, and representatives arising from or relating to the Pre-Petition Financing Agreements, and provided, however, the stipulation and acknowledgement of the Borrower shall be subject to bankruptcy court approval. |
| Waiver or modification of the automatic stay<br>*Location in Senior DIP Credit Agreement:*<br>*Pg.  45 (Section 8.1), 51 (Section 10.8)*<br>*Location in Subordinated DIP Credit*<br>*Agreement: Pg. 45 (Section 8.1), 51 (Section*<br>*10.8)*<br>*Location in Order: Pg.21-23 (¶¶20-21), 36*<br>*(¶ 37)* | Provisions of automatic stay modified as to DIP Lenders. |
| Waiver or modification of authority or right to file a plan, seek an extension of time as to exclusivity to file a plan, request for the use of cash collateral, or request authority to obtain credit under section 364<br>*Location in Senior DIP Credit Agreement:*<br>*Pg. 22 (Section 2.14), 42-45 (Section 8.1)*<br>*Location in Subordinated DIP Credit*<br>*Agreement: Pg. 23 (Section 2.14), 42-46*<br>*(Section 8.1)*<br>*Location in Order: Pg. 14-16 (¶ 12), 27-28*<br>*(¶ 23), 32-33 (¶¶ 29-30), 38-40(¶ 41), 42-* | Borrower shall not prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders or further prime the Pre-Petition Liens beyond what is authorized in the Interim Order and Final Order pursuant to section 364(d) of the Bankruptcy Code or otherwise. |

| Reportable Item | Summary |
|---|---|
| *44 (¶ 45)* | |
| Release, waiver or limitation on claims or other causes of action belonging to the estate or the trustee<br>*Location in Senior DIP Credit Agreement: Pg. 26 (Section 3.10), 42-45 (Section 8.1)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 25-26 (Section 3.10), 42-46 (Section 8.1)*<br>*Location in Order: Pg.16 (¶ 14), 36-37 (¶ 37), 40-42 (¶¶ 42-43)* | The DIP Credit Agreements and the Interim Order provide for the Debtor's stipulation to the extent, priority and non-avoidability of the DIP liens and claims of the Pre-Petition Lender subject to the rights of any party in interest to seek to challenge those stipulations prior to the expiration of the Challenge Period. |
| Indemnification<br>*Location in Senior DIP Credit Agreement: Pg. 19-21 (Section 2.10, 2.12), 48-49 (Section 10.3)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 19-21 (Section 2.10, 2.12), 49 (¶ 10.3)*<br>*Location in Order: Pg. generally, 16 (¶ 14)* | Under the DIP Credit Agreements Borrower shall indemnify DIP Lenders from and against Lending Loss under Section 2.10, and for Indemnified Taxes under Section 2.12, and under Section 10.3 for reasonable out of pocket expenses from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, penalties, judgments, suits and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Loan Documents, (ii) any actual or proposed use of the proceeds of the Loans, or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.. |
| Release, waiver, or limitation of section 506(c) rights<br>*Location in Senior DIP Credit Agreement: Pg. 42 (Section 7.2)*<br>*Location in Subordinated DIP Credit Agreement: Pg. 42 (Section 7.2)*<br>*Location in Order: Pg. 16-17 (¶ 15), 47 (¶ 54)* | Except for the Carve-Out, no charges permitted against Collateral pursuant to Section 506(c), of the Bankruptcy Code. |
| Granting of liens on claims or causes of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).<br>*Location in Senior DIP Credit Agreement: Pg. 4 ("Collateral")*<br>*Location in Subordinated DIP Credit Agreement: Pg. 5 ("Collateral")*<br>*Location in Order: Pg. 18 (¶ 16)* | The DIP Collateral shall recovery or settlement with respect to any other recovery or settlement under Chapter 5 of the Bankruptcy Code "Avoidance Actions". |

516946v4

## JURISDICTION

1.      This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. sections 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. section 157(b).

2.      The statutory predicates for the relief sought herein are sections  105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9019, and LBR 4001-2.

## BACKGROUND

**HISTORY**

3.      In 1998, the Debtor entered the Illinois market through the purchase of 23 underperforming units (18 fee simple properties and 5 ground leases) from Apple South, Inc. Acquisition decision driven by the Debtor's belief that it could improve restaurant operations and robust real estate portfolio.

4.      From 2002 to 2004 after improving Illinois operationally, the Debtor focused on aggressively growing resulting in an average weekly sales increase from $33,000/week to $41,000/week.  The Debtor invested significant capital in remodels, particularly the bar areas of the acquired units.

5.      The Debtor opened ten (10) additional units in Illinois market; closes Deerfield unit due to natural lease expiration.

6.      In 2005, the Debtor completed a sale/leaseback of 18 Illinois properties; portion of proceeds used to pay-off Illinois acquisition debt.   The Debtor's decision to pursue a sale/leaseback was driven by attractive cap rates and real estate market conditions.

7.      From 2005 to 2006, the Debtor opened five (5) additional units in Illinois.  During this high growth phase (1999 through 2006), the Debtor entered several greenfield markets.

Management attempted to take advantage of inexpensive real estate and was often the "first" major retailer in new markets.  Unfortunately, they entered many new markets just prior to the recession, resulting in several anchor tenants pulling out of the developments.  Therefore, the Debtor was left with locations in partially developed areas or areas of low customer traffic (despite prior growth indicators).

8.      From 2006 to 2009, the recession hits, having a particularly negative impact on the Illinois market sales.   Between December 2006 and December 2009, the Illinois unemployment rates jump from 4.5% to 11.3%, respectively (according to the U.S. Bureau of Labor Statistics).  The Debtor attempted to revitalize sales via historical couponing strategy, but is unsuccessful and closes three (3) units.  Furthermore, the Debtor experiences significant senior management turnover in this region.

9.      The recession continues to plague in the Illinois market and the Debtor closed an additional location bringing the current count to 33 units.   Despite some recovery, Illinois unemployment remains almost double its pre-recessionary level at 8.6% (in December 2012, according to the U.S. Bureau of Labor Statistics).   The Debtor continues to experience significant top- and bottom-line pressure.  In order to alleviate the some operating pressure, the Debtor contacted third-party landlords for potential rent concessions, but were unsuccessful.

**CORPORATE AND CAPITAL STRUCTURE**

10.      The Debtor is an Illinois limited liability company whose membership includes W. Curtis Smith as the Managing Member and his wife Susan D. Smith collectively owning 100% of the equity interests in the Debtor.

11.      The Debtor is the obligor on  three notes with a pre-petition balance of approximately  $2,270,776.99, plus accrued but unpaid interest, fees and other charges incurred thereunder (the "Pre-Petition Facility") with Curtis James Investments, an Ohio general

partnership (the "Pre-Petition Lender") as the current noteholder, secured by Debtor's point of sale systems, kitchen displays, furniture, fixtures, equipment, machinery, leasehold improvements, and other property listed in the Pre-Petition Security Agreement (the "Pre-Petition Collateral").

## EVENTS LEADING TO CHAPTER 11

12.    Over the last year, the Debtor tested the market for a potential sale of the Debtor as a whole and in addition to certain affiliated entities.  While there was some interest, eventually an agreement was reached with RMH Illinois LLC (the "Stalking Horse Purchaser") for only a portion of the Debtor's restaurants.  Market conditions indicated that the best way to sell a portion of the restaurant assets free and clear and to obtain the greatest recovery for the benefit of all creditors would be to utilize the chapter 11 protections and 363 sale process.

## USE OF PROCEEDS OF DIP FACILITIES

13.    In order to maintain its operations at the restaurants, the Debtor has successfully negotiated the DIP Credit Agreements, a Senior DIP Credit Facility with RMH Illinois LLC (in this capacity, the Senior DIP Lender) and a Subordinated DIP Credit Facility with Curtis James Investments (in this capacity, the Subordinated DIP Lender).  Under the terms of the DIP Facilities, the Debtor anticipates sufficient available cash to continue operations of the restaurants pending the outcome of an auction and sale.  The DIP Facilities will provide additional comfort to current and future vendors in the ability of the Debtor to make post-petition payments and provide time for the Debtor to complete the sale of the estate's assets to benefit creditors.

## REQUESTED RELIEF

14.    As noted, the Debtor seeks entry of an Interim Order substantially in the form attached hereto as Exhibit A:

516946v4

a) authorizing the Debtor, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, to obtain debtor-in-possession financing in accordance with the terms of the Senior DIP Credit Facility from the Senior DIP Lender pursuant to the terms and conditions of the Senior DIP Credit Agreement including, as necessary, the entry into any and all further agreements as may be necessary to document the terms and conditions thereof;

b) authorizing the Debtor, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, to obtain debtor-in-possession financing in accordance with the terms of the Subordinated DIP Credit Facility from the Subordinated DIP Lender pursuant to the terms and conditions of the Subordinated DIP Credit Agreement including, as necessary, the entry into any and all further agreements as may be necessary to document the terms and conditions thereof;

c) granting the Senior DIP Lender a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, subject only to the Carve-Out;

d) granting the Subordinated DIP Lender a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, subject only to the Senior DIP Lender claims and the Carve-Out;

516946v4

e)   granting the Senior DIP Lender valid, enforceable, and fully-perfected first priority priming liens, subject only to the Carve-Out, upon all of the Debtor's property as provided in and contemplated by the Interim Order and the Senior DIP Credit Facility;

f)   granting the Subordinated DIP Lender valid, enforceable, and fully-perfected first priority priming liens, subject only to Senior DIP Lender liens and the Carve-Out, upon all of the Debtor's property as provided in and contemplated by the Interim Order and the Subordinated DIP Credit Facility;

g)   granting the Pre-Petition Lender the Pre-Petition Replacement Liens, and the Pre-Petition Superpriority Claim, as adequate protection for any decrease in the value of the Pre-Petition Collateral on account of the granting of the DIP Liens to the DIP Lenders, subordinating the Pre-Petition Senior Liens to the Carve-Out, the Debtor's use of the Pre-Petition Collateral, including Cash Collateral, or the imposition of the automatic stay;

h)   finding that, pursuant to Bankruptcy Rule 4001(c)(1), notice of the Interim Hearing is sufficient and adequate and no other or further notice is required;

i)   scheduling and approving the form of the Final Order and manner of notice of the final hearing; and

j)   granting such further and related relief as the Court deems just and equitable.

## THE DIP CREDIT AGREEMENTS

15.   The Debtor has determined that, under the current circumstances, the post-petition financing proposal made by the DIP Lenders most clearly satisfies the Debtor's financing needs and establishes necessary support at the outset of these cases to permit the Debtor time to seek a successful sale of its ongoing business operations.

516946v4

16.   The Debtor and the DIP Lenders engaged in substantial negotiations over the terms of the Interim Order and the DIP Credit Agreements.  Those negotiations were extensive, comprehensive, at arm's length and in good faith.  The Debtor used its best efforts to negotiate the elimination, or narrowing of those provisions implicating issues that are the subject of Bankruptcy Rule 4001(c)(1)(B) and LBR 4001-2.  Nevertheless, there remain a limited number of provisions in the Interim Order and the DIP Credit Agreements that are required to be highlighted by those Rules (the "4001-2 Provisions").  The DIP Lenders have requested Court approval of the 4001-2 Provisions as a condition for providing the financing under the DIP Facilities.  Based upon the totality of the circumstances, the Debtor submits that such protections are appropriate and in the best interest of the creditors of these estates.  Moreover, the 4001-2 Provisions are by no means uncommon to debtor-in-possession financing of the nature that is before the Court.

17.   The Debtor submits that the 4001-2 Provisions are appropriate because of the (i) Debtor's inability to obtain post-petition financing on equal or better terms and (ii) the instant need for access to the additional liquidity to continue the restaurants as a going concern.  The Debtor does not believe that discussions with other potential lenders would yield terms that would be considerably more favorable than those offered under the proposed DIP Facilities.  The DIP Lenders therefore, when considering the restructuring as a whole, offered the Debtor the most attractive terms upon which to obtain post-petition financing.  Without access to the financing, certain vendors may be unwilling to continue business with the Debtor, and the Debtor would therefore face substantially more obstacles and uncertainty in attempting to maintain going-concern restaurants open and competitive on a post petition basis.  The Debtor therefore

516946v4

believes that the terms of the Senior DIP Credit Agreement and the Subordinated DIP Credit Agreement are fair and justified under the circumstances.

## **DEBTOR'S ATTEMPTS TO OBTAIN CREDIT**

18.   Prior to the Petition Date, the Debtor evaluated all of its options with respect to having sufficient resources to operate post-petition including the risks and benefits of operating on cash collateral, and attempted to obtain post petition financing proposals from other lenders. The Debtor was unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code, or secured credit pursuant to section 364(c)(1) of the Bankruptcy Code, recognized the benefits of the additional availability and the confidence instilled by having DIP financing.  In addition, due to its financial constraints, the Debtor is presently unable to obtain, in the ordinary course of business or otherwise, credit allowable under sections 364(c) or 364(d) of the Bankruptcy Code, except from the DIP Lenders on the terms and conditions contained in the DIP Credit Agreements.

19.   Before deciding to enter into the DIP Credit Agreements, the Debtor and the DIP Lenders engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law.  Based on the totality of the circumstances, the Debtor was unable to obtain proposals for post petition financing on terms and conditions more favorable to the Debtor's estates than those set forth in the DIP Credit Agreements.  Any credit extended by the DIP Lenders on or after the Petition Date pursuant to the terms of the DIP Credit Agreements and an order of this Court approving the DIP Credit Agreements should be accorded the benefits of section 364(e) of the Bankruptcy Code.

20.   Accordingly, the Debtor has determined, in the exercise of its respective best and reasonable business judgment, that the financing to be provided by the DIP Lenders is the most

516946v4

favorable funding available under the circumstances and addresses the Debtor's immediate

necessary financing needs while it restructures its business.  The financing available under the

DIP Credit Agreements will enable the Debtor, among other things, to maintain good

relationships with its vendors, provide added confidence to employees and customers and avoid

the cessation of its ongoing operations, and maximize the value of its business as a going

concern pending the sale of its assets.

**APPROVAL OF THE DIP CREDIT AGREEMENTS IS
WARRANTED UNDER THE CIRCUMSTANCES AND APPLICABLE LAW**

**A.    Approval Pursuant to 11 U.S.C. Section 364(c)**

21.  Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of

its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit

and the borrowing is in the best interests of the estate. In re Simasko Production., 47 B.R. 444,

448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtors' best business

judgment indicated financing was necessary and reasonable for benefit of estate); Ames Dept.

Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to DIP Loan, courts "permit

debtors-in-possession to exercise their basic business judgment consistent with their fiduciary

duties"); see also Collier on Bankruptcy, ¶ 364.05 (15" ed. Rev.). Section 364(c) of the

Bankruptcy Code provides in pertinent part:

> (c)    If the trustee [or debtor in possession] is unable to obtain
> unsecured credit allowable under section 503(b)(1) of this
> title as an administrative expense, the court, after notice
> and a hearing, may authorize the obtaining of credit or the
> incurring of debt:
>
> (1)    with priority over any and all administrative
> expenses of the kind specified in section 503(b) or
> 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not
> otherwise subject to a lien; or

15

(3)    secured by a junior lien on property of the estate
that is subject to a lien.

11 U.S.C. § 364(c).

22.   In satisfying the standards of section 364(c), a debtor need not seek credit from
every available source but should make a reasonable effort to seek other sources of credit
available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. See In re
Snowshoe Co., 789 F.2d 1085, 1088 (11th Cir. 1986) (trustee demonstrated by good faith effort
that credit was not available without senior lien by unsuccessfully contacting other financial
institutions in immediate geographic area; "the statute imposes no duty to seek credit from every
possible lender before concluding that such credit is unavailable"); see also Ames, 115 B.R. at 40
(debtors demonstrated the unavailability of unsecured financing where debtors approached
several lending institutions); In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D.
Ohio 1992) (same); In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where
there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor,
"it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search
for financing."), aff'd sub nom., Anchor Say. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120
n.4 (N.D. Ga. 1989).

23.   Courts have articulated a three-part test to determine whether a debtor in possession
is entitled to financing under section 364(c) of the Bankruptcy Code: (i) whether the debtor is
unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an
administrative claim; (ii) whether the credit transaction is necessary to preserve the assets of the
estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate, given the
circumstances of the debtor-borrower and the proposed lender. See, e.g., In re Farmland Indus.,
Inc., 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003); In re Aqua Assocs., 123 B.R. 192, 195-96

16

(Bankr. E.D. Pa. 1991); <u>In re Ames Dep't Stores. Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987); <u>In re Secured Storage Systems</u>, No. 91-14262S, 1992 WL 109064, at *1 (Bankr. E.D. Pa. May 15, 1992).

## <u>NEED FOR FINANCING</u>

24.    Unless the Debtor is authorized to obtain the financing requested herein, the Debtor faces significant risks that its primary vendors will no longer do business with the Debtor, employees will have added concern with respect to their job security, and restaurants would need to be quickly closed.  In addition, the added liquidity will allow the Debtor to maintain ordinary and consistent service and inventory levels moving forward pending the outcome of the auction and sale.  Ultimately, the DIP Facilities will provide necessary comfort of the Debtor's ability to maintain business relationships with vendors, suppliers, and customers, to pay its employees, and to otherwise fund its operations, which is essential to the Debtor's continued viability and preservation and maintenance of the going concern value of the Debtor's business pending the outcome of the auction and sale.

## <u>NO MORE FAVORABLE ALTERNATIVE FINANCING IS AVAILABLE</u>

25.    The Debtor is unable to obtain credit that is not both secured and entitled to superpriority administrative claim status from any other financing source.  The Debtor's obligations under the Pre-Petition Credit Facility are secured by a large portion of the Debtor's assets.  Under these circumstances, and given the Debtor's current financial status, the Debtor believes that no lender would provide financing to the Debtor other than on a secured and superpriority basis.  The Debtor made efforts to negotiate alternative debtor in possession financing arrangements with the DIP Lenders, and with other entities.  No lender offered financing on terms that, taken as a whole, were better than those provided under the DIP Credit Agreements.  Thus, the Debtor can show "by a good faith effort that credit was not available

without" the protections of section 364(c) of the Bankruptcy Code. <u>Snowshoe</u>, 789 F.2d at 1088.

Accordingly, the Debtor believes that the financing arrangements proposed under the DIP Credit

Agreements represent the best available to it at this time.

<u>**THE FINANCING IS FAIR AND REASONABLE**</u>

26.  The Debtor believes that the terms of the DIP Credit Agreements and Interim Order

are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured

financing to debtors in possession, reflect the Debtor's exercise of its prudent business judgment

consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair

consideration.  The terms and conditions of the DIP Credit Agreements and the Interim Order

have been negotiated in good faith and at arms' length by and among the Debtor and the DIP

Lenders, with all parties represented by counsel.  Accordingly, the Debtor believes that any

credit extended under the terms of the Interim Order is extended in good faith by the DIP

Lenders as that term is used in section 364(e) of the Bankruptcy Code.

27.  Given the Debtor's current financial status, the Debtor is unable to obtain credit that

is not secured with a priming lien above that of the Pre-Petition Lender.  Accordingly, after

appropriate investigation and analysis, the Debtor's management has concluded that the DIP

Credit Agreements are the best alternative available under the circumstances.  Bankruptcy Courts

routinely defer to the Debtor's business judgment on most business decisions, including the

decision to borrow money.  <u>See</u> <u>Group of Institutional Investors v. Chicago Mil. St. P. & Pac.</u>

<u>Ry.</u>, 318 U.S. 523, 550 (1943); <u>In re Simasko Prod. Co.</u>, 47 B.R. 444, 449 (D. Colo. 1985)

("Business judgments should be left to the board room and not this Court"); <u>In re Lifeguard</u>

<u>Indus., Inc.</u>, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the

administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's

provision for private control of administration of the estates, and threaten the court's ability to

18

control a case impartially."); <u>Richmond Leasing  Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).

28.   Unless the decision is arbitrary and capricious, a bankruptcy court should defer to a debtor's business judgment regarding the need for, and the proposed use of, the requested funds. <u>In re Curlew Valley Assoc.</u>, 14 B.R. 507, 511-13 (Bankr. D. Utah 1981).   Bankruptcy Courts will generally not second guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." <u>Id</u>. at 513-14 (footnotes omitted).

29.   In the instant case, the Debtor has exercised sound business judgment by seeking advice from its legal and financial advisors in making the determination that the DIP Credit Agreements and related DIP Security Agreements are fair and reasonable and in the best interest of the Debtor's estate.  Accordingly, the Debtor should be granted authority under section 364(c) of the Bankruptcy Code to enter into the DIP Credit Agreements and borrow funds from the DIP Lenders on the basis described herein and in the DIP Credit Agreements, on a super-priority basis.

**B.      Approval Pursuant to 11 U.S.C Section 364(d)**

30.   Section 364(d) of the Bankruptcy Code provides that:

> (d)      The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (1)      the trustee [or debtor in possession] is unable to obtain such credit otherwise; and
>
> (2)      there is adequate protection of the interest of the holder so the lien on the property of the estate on which such senior or equal line is proposed to be granted.

11 U.S.C. § 364(d).

516946v4

31.    Hence, absent consent, in order or to obtain what is commonly referred to as a "priming lien," the Debtor is required to establish that (i) there was no other alternative to the DIP Credit Agreements and (ii) the interests of the senior lien holders being "primed" will be adequately protected in the face of the proposed loan.  In re First South Sav. Ass'n, 820 F.2d 700 (5th Cir. 1987); In re W&W Protection Agency, Inc., 200 B.R. 615, 623 (Bankr. S.D. Ohio 1996).

32.    The Pre-Petition Lender consents to the priming of its pre-petition liens and to the adequate protection provided to it in the Interim Order.

## 11 U.S.C. SECTION 361 - ADEQUATE PROTECTION

33.    The term "adequate protection" is not expressly defined by the Bankruptcy Code. See In re Estes, 185 B.R. 745 (Bankr. W.D. Ky. 1995); In re Carter, 1994 U.S. Dist. LEXIS 20573 at *11 (W.D. Ky., June 17, 1994).  However, when adequate protection is required under sections 362, 363, or 364 of the Bankruptcy Code of an interest of an entity in property, adequate protection *may be* provided by:

a)    requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

b)    providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

c)    granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the "indubitable equivalent" of the entity's interest.

11 U.S.C. § 361.

34.    Since the Bankruptcy Code does not *expressly* define "adequate protection," the methods listed under section 361 by which adequate protection may be provided to a secured creditor are neither exclusive nor exhaustive; hence, a bankruptcy court may accept a method of

516946v4

adequate protection that does not fall under any of the methods set forth in section 361.  See In re Estes, 185 B.R. 745 (Bankr. W.D. Ky. 1995); In re Carter, 1994 U.S. Dist. LEXIS 20573 at *11 (W.D. Ky., June 17, 1994) (the methods of compensation listed in section 361 are neither exclusive nor exhaustive).

35.    In fact, what constitutes adequate protection is a question of fact that is to be determined by the court on a case-by-case basis.  In re Rocco, 319 B.R. 411 (Bankr. W.D. Pa. 2005).  It was the intent of Congress in section 361 to give courts flexibility to fashion relief in light of each case in general equitable principals.  In re Wilson, 30 B.R. 371 (Bankr. E.D. Pa. 1983).  As a result, courts have developed general principals to guide the adequate protection determination.  What constitutes adequate protection is determined on a case-by-case basis, and the equitable factors which the court might consider include: (1) whether the claim is over or under secured, (2) the parties reasonable expectations, (3) the quality of the collateral, (4) the length of the stay, (5) whether the lien value is stable, depreciating or appreciating, (6) whether taxes and other payments are being made on the collateral and (7) whether the debtor has a high or low chance of reorganization.  See In re Briggs Transp. Co., 780 F.2d 1339 (8th Cir. 1985).

36.    "The purpose of adequate protection is to provide a secured creditor the benefit of its bargain while enabling the debtors to use the secured property; it is not intended as an 'after the fact' method of allowing creditors to obtain the full amount of secured claims."  In re Carter, 1994 U.S. Dist. LEXIS 20573 at *12 (W.D. Ky., June 17, 1994).  Furthermore, "'[w]hile an equity cushion is generally considered prima facie evidence of adequate protection, the absence of an equity cushion does not establish the converse.'"  Id.  A "'creditor's right to adequate protection is limited to the lesser of the value of the collateral or the amount of the secured claim . . . [and] to the extent that the [creditor's] lien claims exceeded the value of the Debtor's

collateral on the day of filing, the claim was an unsecured claim . . . one which was not entitled

to adequate protection.'" In re Delbridge, 104 B.R. 824 (E.D. Mich. 1989) (internal citations

omitted).

37.   Further, there are two recognized policies underlying Chapter 11, "preserving going

concerns and maximizing property available to satisfy creditors." Bank of America National

Trust and Savings Assoc. v. North LaSalle Street Partnership, 526 U.S. 434, 453 (1999).

Preserving the going concern value of a business essentially ensures additional adequate

protection to creditors in most cases; as the going concern value is typically always higher than

the piecemeal liquidation of assets.   In fact, experience has demonstrated that the sale of a

business as an operating unit enhances value more than the piecemeal sale of particular assets.

Texaco, for example, filed for bankruptcy in the face of a $10.53 billion judgment to Pennzoil.

In re Texaco, Inc., No. 87-20142 (HS) (Bankr. S.D.N.Y. 1987). When Texaco filed for

bankruptcy, no one thought for a moment that the giant oil company would be shut down and its

assets scattered to the winds. Parties realized that the going concern value would bring about a

higher recovery to creditors.   See also In re WorldCom, Inc., No. 02-13533 (AJG) (Bankr.

S.D.N.Y. 2002) (fraud); In re Bethlehem Steel Corp., No. 01-15288 (BRL) (Bankr. S.D.N.Y.

2001) (pension liability).   In each case, it was recognized that the going concern value of the

business preserved value for the benefit of the creditors.   "The preservation and maintenance of

the going concern value of the Debtor is integral to a successful reorganization of the Debtor

pursuant to the provisions of the Chapter 11 and the Bankruptcy Code." In re Western Pacific

Airlines, Inc., 223 B.R. 567, 568 (Bankr. Co. 1997).   Such is the case in this instant matter.

38.   In light of the above, the Debtor proposes to grant to the Pre-Petition Lender the

following as adequate protection within the meaning of section 361:

a) <u>Specific Adequate Protection to the Pre-Petition Lender in regards to the Prepetition Credit Facility</u>.   As adequate protection for any diminution in value of the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Lender shall receive, as adequate protection: (a) Pre-Petition Replacement Liens in the Pre-Petition Collateral, junior only to the DIP Liens, and the Carve-Out; and (b) Pre-Petition Superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code, junior only to the DIP Liens, DIP Superpriority Claims, and Carve-Out.

b) <u>Preservation of Going Concern Value of Business for benefit of Pre-Petition Lender</u>. Permitting the Debtor to enter into the DIP Credit Agreements will preserve the going-concern value of the Debtor's business and in doing so preserve the value of the secured party's interests more so than would be obtained through an immediate liquidation.  If this Motion is denied, the Debtor will be forced to close and liquidate its remaining operations, which will result in an immediate, irreparable and significant decrease in the value of the operation and lead to a decreased recovery for the Pre-Petition Lender.   In light of the fact that this chapter 11 case are still in its embryonic stage and they are facing immediate and irreparable harm by being forced to close its doors and liquidate all inventory unless they obtain some temporary relief designed to prevent closing, it is only reasonable that this Court provide the Debtor a period of time in which to attempt to salvage the going concern value.   As courts have found, "[i]t would appear that a sale by a going concern . . . would produce a more favorable result than a replevin action or a liquidation sale."  In re Staufen's Music House, Inc., 213 B.R. 842, 844 (Bankr. E.D. Mo. 1997).  Under the fact of the

516946v4

instant case, it is readily apparent that the going concern value of the Debtor would

far exceed the piecemeal liquidation of the assets.

c) <u>Covenant Compliance</u>.   As additional adequate protection for the use of the Pre-

Petition Collateral by the Debtor, irrespective of whether or not the commitments

under the DIP Credit Agreements have terminated in accordance with their own

terms, (1) the Debtor shall remain in compliance with each negative covenant and

affirmative covenant under the DIP Credit Agreements (subject to any modifications,

amendments, consents or waivers made in accordance with the Interim DIP Order)

and (2) the Debtor shall ensure that no Event of Default under the DIP Credit

Agreements occurs.

### FAR REACHING NEGATIVE EFFECT OF FAILURE TO OBTAIN APPROVAL OF DIP CREDIT AGREEMENTS

39.   The Debtor's inability to utilize the funds made available pursuant to the DIP Credit

Agreements will immediately create substantial issues with Debtor's ability to provide the

restaurants with adequate inventory and staffing, create customer dissatisfaction and, ultimately

could cause the cessation of its operations and result in a complete liquidation of all restaurants,

which will have far reaching negative ramifications including the dismissal of the Debtor's

remaining employees.   In addition, the value of the Debtor's going concern operations will

plummet overnight.   Accordingly, the only way to protect the value of the Debtor's estate to the

fullest extent possible is for the Debtor to obtain the debtor in possession financing provided by

the DIP Credit Facilities.

### C.   DIP Credit Agreements Negotiated in Good Faith

40.   The Debtor, in the exercise of its prudent business judgment and consistent with its

fiduciary duties, has concluded that the terms of the DIP Credit   Agreements are reasonable

516946v4

Document      Page 25 of 29

under the circumstances, competitive in today's marketplace, and address the Debtor's working capital and liquidity needs. The DIP Credit Agreements were negotiated in good faith and at arms' length by all parties. The Debtor was assisted in the negotiations by sophisticated and experienced financial advisors and counsel.  Based on the good faith efforts of the Debtor and the DIP Lenders in negotiating a financing arrangement that will benefit the Debtor, its estate and its creditors, the Debtor respectfully requests that the DIP Lenders receive the protections of Bankruptcy Code section 364(e) with respect to the DIP Credit Agreements.

**D.      Summation**

41.   In the Debtor's business judgment, the DIP Credit Agreements are clearly necessary to preserve the assets of the Debtor's estate and the terms pertaining thereto are fair and reasonable. The Debtor has insufficient, if any, cash with which to operate following the Petition Date.  The DIP Credit Agreements provide sufficient liquidity by providing the Debtor with continued borrowing capacity so that it can have sufficient funds with which to operate its business pending the outcome of the auction and sale.  The Debtor requires immediate access to the funds available under the proposed DIP Credit Agreements in order to ensure that its business operations continue uninterrupted and that its inventory levels and business operations are maintained and enhanced for the benefit of its estate, its creditors and its employees.

42.  The Debtor's suppliers may not release shipments or may offer the Debtor less favorable payment terms if the DIP Credit Facilities are not approved.  These funds are necessary for the Debtor to meet its liquidity and capital needs in the immediate future pending a final hearing on the Motion.  Without immediate access to these funds the Debtor would not be able to meet its customer commitments, pay employee wages and benefits, or pay its post-petition ordinary course of business obligations.  Any potential disruptions of the Debtor's operations

would be devastating and create irreparable damage to the Debtor's going concern value and its estates at this critical juncture.

43.   The inability of the Debtor, without the proceeds from the DIP Credit Facilities, to make timely payments on certain obligations will result in a permanent and irreversible loss of business for the Debtor, causing a loss of value to the detriment of the Debtor and all parties in interest in this chapter 11 case.   Finally, the Debtor anticipates that the approval and implementation of the DIP Credit Agreements will be viewed favorably by the Debtor's employees, suppliers and customers and thereby greatly enhance the Debtor's ability to maximize the value of the estate.   In short, the ultimate success of the Debtor's efforts to maximize ongoing business value hinges upon entering into and drawing funds under the DIP Credit Agreements.

44.   For the reasons discussed above, the Debtor submits that it has exercised sound business judgment in determining that the DIP Credit Agreements represent the best available financing, is in the best interest of the estate, and contains terms that are fair and reasonable under the circumstances.   Accordingly, the Debtor requests authority to enter into the DIP Credit Agreements, borrow funds from the DIP Lenders thereunder, and take the other actions contemplated and requested herein.

## FINAL HEARING AND NOTICE

45.   Pursuant to Bankruptcy Rule 4001(b), a final hearing on this emergency motion to borrow funds under a post-petition financing arrangement may not be commenced earlier than fifteen days after the service of such motion.   Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize the obtaining of credit necessary to avoid immediate and irreparable harm to the debtor's estate. Fed. R. Bankr. Proc. 4001(b)(2).

516946v4

46.    As noted above, it is critical to the success of this chapter 11 cases that the Debtor be able to obtain debtor in possession financing.   Based on the current status of the Debtor's business, it is also critical that the Debtor be permitted to enter into such financing facilities and to draw funds thereunder sooner than the 15 days notice required under Bankruptcy Rule 4001 for a final hearing on this Motion in order to operate its business and preserve value at this critical juncture. The Debtor believes that it will suffer immediate and irreparable harm in the absence of an interim hearing and approval of interim borrowings under the DIP Credit Facilities.

47.    The Debtor requests that the Court (a) conduct an expedited hearing with respect to the Interim Order (as described herein) and (b) schedule the Final Hearing on the Final Order at the earliest possible date in accordance with Bankruptcy Rule 4001(b), but in no event later than _____ days from entry of the Proposed Order on an interim basis.

## NOTICE

48.    No trustee, examiner or creditors' committee has been appointed in this chapter 11 case.   A copy of the Motion was served upon: (i) the Debtor; (ii) counsel to the Debtor; (iii) counsel to the Senior DIP Lender; (iv) counsel to the Subordinated DIP Lender; (v) the Office of the United States Trustee, Eastern District of Kentucky; (vi) holders of the 30 largest unsecured claims; (vii) all creditors known to Debtor who have, or may have liens against any of Debtor's assets, and (viii) all applicable state and federal taxing authorities.   In light of the requested relief, the Debtor submits that no further notice is required.

## NO PRIOR REQUEST

49.    No prior request respecting the relief sought herein has been submitted to this or to any other Court granting the relief requested herein.

## <u>NOTICE OF HEARING</u>

50.   Notice is hereby given that the foregoing Motion will be heard by the Court on April 24, 2013 at 9:30 a.m. (ET) or as soon thereafter as counsel may be heard in the United States Bankruptcy Court, 3rd Floor Courtroom, 100 East Vine Street, Lexington, Kentucky 40507.

**WHEREFORE**, the Debtor respectfully requests that this Court enter the Proposed Order in the form attached hereto as <u>Exhibit A</u>: (a) authorizing the Debtor to obtain post-petition secured and superpriority financing on an interim basis as set forth in the Senior DIP Credit Agreement and the Subordinated DIP Credit Agreements; (b) scheduling a final hearing; (c) approving the form and manner of notice of final hearing; and (d) granting other related relief.

Dated:  April 23, 2013                                  Respectfully submitted,
         Lexington, Kentucky

DINSMORE & SHOHL LLP

*/s/  Ellen Arvin Kennedy, Esq.*
Ellen Arvin Kennedy, Esq.
David T. May, Esq.
Lexington Financial Center
250 West Main Street, Suite 1400
Lexington, KY  40507
Telephone:  859-425-1000
Facsimile:   859-425-1099
Email:  ellen.kennedy@dinsmore.com
       david.may@dinsmore.com

**PROPOSED COUNSEL FOR DEBTOR AND DEBTOR-IN-POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was served this the 23rd day of April 2013, electronically upon all parties having entered an appearance in this case in accordance with the method established under this Court's CM/ECF Administrative Procedures and Standing Order dated July 25, 2002, and to the Debtor's 30 Largest Creditors and Counsel to the Senior DIP Lender and the Subordinated DIP Lender.

*/s/ Ellen Arvin Kennedy, Esq.*
**PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR-IN-POSSESSION**

516946v4