**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | |
|---|---|
| In re:<br><br>**AppleILLINOIS, L.L.C.,**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 13-20723 (TNW)** |

**DECLARATION OF W. CURTIS SMITH IN SUPPORT OF**
**FIRST-DAY MOTIONS AND APPLICATIONS**

I, W. Curtis Smith, hereby declare:

1.       I am the Managing Member of AppleILLINOIS, L.L.C. (referred to herein as the "Company" or the "Debtor"). I am familiar with the day-to-day operations, business affairs, books and records of the Debtor.

2.       I submit this Declaration in connection with the voluntary chapter 11 petitions, first-day motions and applications of the Debtor in the above-captioned chapter 11 case.[1] All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Company, upon information supplied to me by counsel to the Debtor, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtor's operations, financial condition and related business issues. If I were called upon to testify, I could and would testify competently to the facts set forth herein, and am authorized to submit this Declaration on behalf of the Debtor.

3.       Part I of this Declaration describes the business of the Debtor and the relevant background preceding the filing of these chapter 11 petitions. Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtor

---

[1] The term "first-day motions" as it is used in this Declaration refers to both the First and Second Day Motions.

concurrently herewith.  I am familiar with the first-day motions and applications filed by the Debtor.

## I. BACKGROUND

### History

4.     In 1998, the Debtor entered the Illinois market through the purchase of 23 underperforming units (18 fee simple properties and 5 ground leases) from Apple South, Inc. Acquisition decision driven by the Company's belief that it could improve restaurant operations and robust real estate portfolio.

5.     From 2002 to 2004 after improving Illinois operationally, the Debtor focused on aggressively growing resulting in an average weekly sales increase from $33,000/week to $41,000/week.  The Debtor invested significant capital in remodels, particularly the bar areas of the acquired units.

6.     The Debtor opened ten (10) additional units in the Illinois market and closed its Deerfield unit due to natural lease expiration.

7.     In 2005, the Debtor completed a sale/leaseback of 18 Illinois properties; a portion of proceeds used to pay-off Illinois acquisition debt.  The Debtor's decision to pursue a sale/leaseback was driven by attractive cap rates and real estate market conditions.

8.     From 2005 to 2006, the Debtor opened five (5) additional units in Illinois.  During this high growth phase (1999 through 2006), the Company entered several greenfield markets. Management attempted to take advantage of inexpensive real estate and was often the "first" major retailer in new markets.  Unfortunately, the Company entered many new markets just prior to the recession, resulting in several anchor tenants pulling out of the developments.  Therefore, the Debtor was left with locations in partially developed areas or areas of low customer traffic (despite prior growth indicators).

9.      From 2006 to 2009, the recession hit and, had a particularly negative impact on the Illinois market sales.    Between December 2006 and December 2009, the Illinois unemployment rates jumped from 4.5% to 11.3%, respectively (according to the U.S. Bureau of Labor Statistics).  The Debtor attempted to revitalize sales via historical couponing strategy, but was unsuccessful and closed three (3) units.  Furthermore, the Company experienced significant senior management turnover in this region.

10.     The recession continued to plague the Illinois market and the Debtor closed an additional location bringing the current count to 33 units.   Despite some recovery, Illinois unemployment remains almost double its pre-recessionary level at 8.6% (in December 2012, according to the U.S. Bureau of Labor Statistics).    The Debtor continues to experience significant top- and bottom-line pressure.  In order to alleviate the some operating pressure, the Company contacted third-party landlords for potential rent concessions, but were unsuccessful. The Illinois units began to lose money monthly.

**Corporate and Capital Structure**

11.     The Debtor is an Illinois limited liability company whose membership includes W. Curtis Smith as the Managing Member and his wife Susan D. Smith collectively owning 100% of the equity interests in the Debtor.

12.     The Debtor is the obligor on  three notes with a pre-petition balance of approximately  $2,270,776.99, plus accrued but unpaid interest, fees and other charges incurred thereunder (the "Pre-Petition Facility") with Curtis James Investments, an Ohio general partnership (the "Pre-Petition Lender") as the current noteholder, secured by Debtor's point of sale systems, kitchen displays, furniture, fixtures, equipment, machinery, leasehold improvements, and other property listed in the Pre-Petition Security Agreement (the "Pre-Petition Collateral").

**Events Leading to Chapter 11**

13.     Over the last year, the Debtor tested the market for a potential sale of the Debtor

as a whole and in addition to certain affiliated entities through a financial advisor.  While there

was some interest from the approximately 50 potential buyers whose interest was solicited, it

became apparent that a public sales process was the appropriate path for the Debtor to take.

Market conditions indicated that the best way to sell a portion of the restaurant assets free and

clear and to obtain the greatest recovery for the benefit of all creditors would be to utilize the

chapter 11 protections and 363 sale process.  Eventually an agreement was reached with RMH

Illinois LLC (the "Stalking Horse Purchaser") for sale of only a portion of the Debtor's

restaurants.

**Plans Going Forward**

14.     In order to maintain its operations at the restaurants until a sale can be held, the

Debtor has successfully negotiated DIP Credit Agreements through a Senior DIP Credit Facility

with RMH Illinois, LLC (in this capacity, the "Senior DIP Lender"), and a Subordinated DIP

Credit Facility with Curtis James Investments (in this capacity, the "Subordinated DIP Lender").

Under the terms of the DIP Facilities, the Debtor should have enough available cash to continue

operations of the restaurants pending the outcome of an auction and sale.  The DIP Facilities will

provide additional comfort to current and future vendors in the ability of the Debtor to make

post-petition payments and provide time for the Debtor to complete the sale of the estate's assets

to benefit creditors.

## II.      FIRST-DAY MOTIONS

15.     The Debtor has requested various types of relief in "first-day" motions and

applications (collectively, the "First-Day Motions") in order to minimize the adverse effects of

4

the commencement of this chapter 11 case on its business.  I believe that a critical and necessary element in successfully administering this chapter 11 case is the approval of the Debtor's First Day Motions submitted concurrently herewith.  The factual background and support for each respective First Day Motion is set forth below.

      **a) <u>Motion of the Debtor in Possession for an Order (A) Scheduling Expedited Hearings on Certain First Day Motions and (B) Approving Form and Manner of Notice Thereof</u>**

16.      By the above referenced motion (the "Expedited Hearing Motion"), the Debtor seeks entry of an order (i) scheduling an expedited hearing on certain first day motions (the "First Day Motions") and (ii) approving the form and manner of notice of the expedited hearing.  Contemporaneously with the commencement of this chapter 11 case and the filing of this Declaration, the Debtor filed, among other things, the First Day Motions.

17.      I believe that the First Day Motions involve matters that require emergency and expedited hearings.  As described in detail in each of the First Day Motions, the relief requested is essential to obtain financing and to maintain the Debtor's operations and business throughout this chapter 11 case, as well as to administer this case in an efficient manner.  The First Day Motions are of the type heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtor's operations and its transition into chapter 11.

18.      Although the Debtor seeks the scheduling of a hearing on the First Day Motions on the Commencement Date, and therefore without notice, prior to or immediately upon the filing of its chapter 11 petition the Debtor provided electronic or hard copies of the First Day Motions to  (i) the Debtor; (ii) counsel to the Debtor; (iii) counsel to Senior DIP Lender; (iv) counsel to Subordinated DIP Lender; (v) the Office of the United States Trustee, Eastern District

of Kentucky; (vi) and holders of the 30 largest unsecured claims (collectively, the "Initial Master Service List"); and (vii) those entities specifically affected by a specific motion.

19.    Accordingly, I believe an expedited hearing on the First Day Motions is warranted in this chapter 11 case and further believe the form and manner of notice is appropriate as detailed in the Expedited Hearing Motion and the appropriate relief should be granted.

> **b)  Motion Of The Debtor-In-Possession For An Order (I) Authorizing, But Not Directing, The Debtor To (A) Pay Certain Prepetition Wages, Salaries, Bonuses And Other Compensation; (B) Continue Employee Benefit Programs In The Ordinary  Course Of Business; And (C) Pay Certain Reimbursable Expenses; (II) Authorizing, But Not Directing, The Debtor To Make Deductions From Employee Paychecks; And (III) Authorizing And Directing Banks And Other Financial Institutions To Pay All Checks And Electronic Payment Requests Made By The Debtor Relating To The Foregoing**

## I.    EMPLOYEE OBLIGATIONS

**Unpaid Compensation**

20.    The Debtor pays employees on a bi-weekly basis (a "Pay Period"), which runs from Monday of the first week until Sunday of the second week, and is paid on the second Thursday following the Sunday that ends the Pay Period.    The Debtor's average gross compensation for Employees, including wages and salaries, during a pay period is approximately $790,500.  The payroll is made primarily by check with about a quarter of employees receiving payments via direct deposit through electronic transfer of funds directly to the Employees' accounts.

21.    As of the Commencement Date, the Debtor has not paid its Employees all prepetition wages, which, as noted, are held in arrears and paid every other Friday.  Additionally, compensation may be due and owing as of the Commencement Date because:

a.    some discrepancies may exist between the amounts paid and amounts Employees or others believe should have been paid, which upon resolution, may reveal that additional amounts are owed to such Employees;

b.    there may have been difficulties in completing an electronic fund transfer into an Employee's account;

c.    variations in the Debtor's various payroll records; and

d.    the Employee's checks may not have cleared the financial institution

22.    As the Debtor's payrolls run in arrears, the Debtor is asking for authority to pay such amounts owed, and are therefore estimating that, as of the Commencement Date, approximately $754,500 will be outstanding, which consists of accrued wages, salaries, overtime pay, and other compensation (excluding reimbursable expenses, vacation pay, and incentive bonuses) earned prior to the Commencement Date.

23.    The numbers reflected herein are for the amounts accrued but where no check or other payment has been made.  The Debtor's most recent bi-weekly payroll for hourly employees was completed on Thursday April 18th, 2013, covering the Pay Period.  As a result, the Debtor has outstanding payroll obligations which have accrued from Monday, April 8th, 2013 through the Commencement Date for Employees.[2]  There are also checks that have likely not yet been deposited by the Employees arising from the most recent payroll.  The Debtor requests authority to continue to honor, in the ordinary course of business, any outstanding payroll checks for current employees.  The Debtor does not believe any individual is owed in excess of $2,757.00 for accrued but unpaid wages.

24.    The payment of the prepetition Employee Wages and Benefits is necessary when compared with the size of the Debtor's estate and the damage to the Debtor's chapter 11 case

---

[2] Ten (10) corporate employees of Debtor are employed in Chicago ("Corporate Employees") and were paid on a Monday April 22, 2013 for the period through April 21st, 2013 in the normal course of business operations.

that would ensue if Employee morale were disrupted by the Debtor's failure to meet its Employee Wages and Benefits obligations.

**Remitting and Paying Appropriate Deductions and Withholdings**

25.    The Debtor deducts certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, (b) other pre-tax and after-tax deductions payable pursuant to certain employee Benefits discussed herein (such as an Employee's share of health care Benefits, insurance premiums, 401(k) contributions, legally ordered deductions and other miscellaneous deductions), as well as (c) deductions for individual insurance programs selected by the Employees such as voluntary life insurance (collectively, the "Deductions").

26.    On average, each Pay Period, the Deductions total approximately $35,546 for Employees.   However, due to the commencement of this chapter 11 case, some of these Deductions may not have been deducted from the Employees' earnings and/or forwarded to the appropriate third-party recipients prior to the Commencement Date.   Accordingly, the Debtor seeks authority to continue to forward these prepetition Deductions (which are held in trust) to applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Commencement Date.

27.    Further, the Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local taxing authorities, (the "Withheld Amounts").   On average, the Withheld Amounts total approximately $215,000 per Pay Period for Employees. The Debtor must also match from its own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes").   The Employer Payroll Taxes, together with the Withheld Amounts, are referred to collectively hereafter as the "Payroll Taxes."

8

28.     Prior to the Commencement Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and reserved for the Employer Payroll Taxes.  However, due to this chapter 11 filing, the Payroll Taxes may not have been forwarded to the appropriate taxing authority.  As a result, the Debtor seeks authority, at its discretion, to continue to honor and process the prepetition obligations with respect to the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Commencement Date.

### Honoring Reimbursable Expenses

29.     Prior to the Commencement Date, and in the ordinary course of business, employees incurred certain expenses on the Debtor's behalf, which include but are not limited to, meals, parking, automobile mileage and other business related expenses.  In addition, when the Debtor asks employees to relocate to a new area, the Debtor reimburses employees for the transportation of household goods and personal effects and travel expenses (collectively the "Reimbursable Expenses").

30.     Employees use their personal funds to pay for the Reimbursable Expenses, and submit check requests to their supervisor who reviews and approves the requests and then forwards them to accounting for payment.  The Employees are willing to use their own funds based on the expectation and belief they will be reimbursed for these expenses by the Debtor.  Upon approval of the expenses, the Debtor reimburses the Employees out of corporate funds.  Reimbursable Expenses average approximately $8,918 per month.

31.     To the extent any Employees incurred the Reimbursable Expenses, such expenses were incurred on the Debtor's behalf and in the scope of their employment, with the understanding that such expenses would be paid by the Debtor.  Accordingly, the Debtor requests authority, in its sole discretion, to (a) continue reimbursing the Reimbursable Expenses

in accordance with prepetition practices, (b) modify its prepetition policies relating thereto, and (c) pay all Reimbursable Expenses that relate to the prepetition period.

## II.   EMPLOYEE BENEFITS

32.     The Debtor provides Employees, in the ordinary course of business, with a number of Employee Benefits designed to assist its Employees and the Employees' eligible dependents in meeting certain financial burdens, including those arising from illness, disability, and death (collectively, the "Employee Benefits"), including but not limited to: (a) medical and dental insurance; (b) workers' compensation insurance; (c) vacation time and other paid absences; (d) 401(k) savings plan; and (e) other miscellaneous employee Benefits.  The Debtor seeks authorization, but not direction, to pay or otherwise continue to honor these Employee Benefits, as described herein.

**<u>Medical Plans</u>**

33.     The Debtor provides salaried employees who qualify under the medical plan policy with medical insurance, which is provided by Humana Insurance.  On a monthly basis, the Debtor, with contributions from the Employees, funds the Medical Plan.  The three options under the Medical Plan are (1) Coverage First 1500 - 80/50 Plan with a $1,500 deductible; (2) Coverage First 3000 – 90/60 Plan with $3000 deductible; and (3) Coverage First 5000 – 100/70 Plan with $5000 deductible.

34.     The average monthly cost of the Medical Plan is $71,595.86.  Employees' contributions total approximately $18,075.99 per month and the Debtor's contributions total approximately $53,519.87 per month.  Thus the Debtor's contribution is approximately 70% of the overall cost of the Medical Plan.

35.     The Debtor pays the Medical Plan in advance and therefore believes that they do not have any accrued but unpaid, prepetition liabilities pertaining to the Medical Plan.  In an

abundance of caution, in the event of any unpaid amounts, the Debtor seeks Court approval to pay any amounts owed in the ordinary course of business. Further, there may be Medical Payments that have not yet cleared the bank. The Debtor also requests that such issued checks be permitted to be honored in the ordinary course of business. The Medical Plan is referred to hereinafter as the "Health Insurance."

36.    Employees rely on the Debtor to provide continuing health care Benefits. Employee welfare, morale and expectations would be significantly harmed if the Debtor were to fail in paying any amounts due with respect to the Health Insurance.

37.    Furthermore, and for similar reasons, the Debtor seeks to continue to provide continuation coverage under section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B).

38.    The premiums for the COBRA coverage are paid by the Debtor. On a monthly basis, the Debtor collects approximately $-0- (no current COBRA participants) from the COBRA participants.

39.    By this Motion, the Debtor seeks authority, in its sole discretion to: (a) continue the Health Insurance for its Employees in the ordinary course of business; (b) continue making contributions to the Medical Plans; (c) pay any amounts related to the Health Insurance and the Employee Benefits, including any premiums, claim amounts and administrative fees, to the extent that such amounts remain unpaid on the Commencement Date; and (d) pay its COBRA obligations.

**Workers' Compensation**

40.    Pursuant to state laws, the Debtor must maintain workers' compensation liability coverage in the ordinary course of business. As noted, the Debtor employs approximately 126 salary employees and 1,673 hourly employees at its operations in Illinois.

41.    The Debtor is insured through PM Insurance for Workers' Compensation & Employer's Liability insurance for itself and other affiliate entities in the following states: Indiana, Florida, Kentucky, and Illinois.  There is a $250,000 deductible.  The Debtor and related affiliates combined pay a total annual premium of approximately $891,000.00.  Premiums paid through 4/1/13 are $670,145 with a remaining premium is $221,000.  Apple Sauce, Inc. (non-debtor affiliate) pays approximately $74,000 every one month.

42.    By this Motion, the Debtor requests authority to continue to maintain its Workers' Compensation Program in the ordinary course of business and pay any prepetition amounts related thereto.

**Vacation, Holiday and Paid Leave**

a.    Vacation

43.    Salaried, Non-Restaurant employees earn vacation based on a single "trigger date", January 1 of each year. Salaried restaurant employees earn vacation based on "trigger dates", January 1 and July 1 of each year.  During the first interval of employment vacation time is calculated on a pro rata basis.  For example from April 1 to July 1 of a given year.  For hourly employees vacation plan has a requirement to average 35 hours per week for one anniversary year, then the average weekly earnings is paid out as an additional check.

44.    The ability of Employees to accrue unused vacations time based on their length of employment: 10 days up to 5 years, then 15 days up to 15 years, and 20 days for over 15 years..

45.    Currently, the Debtor estimates that there is approximately $180,000 of accrued but unpaid prepetition liabilities pertaining to Vacation Time.  By the Employee Wages and Benefits Motion, the Debtor seeks Court approval to continue to permit Employees to accrue and use their vacation days in the ordinary course of business, without disruption.  The Debtor also

seeks the authority to pay, in Debtor's discretion, any lump-sum payments of unused vacation time, should and when an Employee relationship ends.

b.     Holiday Pay

46.     The Debtor provides salaried full time Employees paid holidays (the "Holiday Pay").

c.     Jury Duty Leave

47.     Salaried Employees are eligible for jury duty leave pay.  The average monthly cost associated with the jury duty benefit is minimal occurring very infrequently.

d.     Bereavement Leave

48.     The Debtor offers Employees up to 3 days of bereavement leave for eligible family members, which may be extend upon the request and approval of the employee's department head and human resources.  Salaried Employees receive the benefit as paid and included in their wages.  Hourly Employees do not receive paid bereavement leave.  The Debtor is unable to estimate the monthly cost as Bereavement Leave because it is not tracked separately but anticipate its cost will continue to be *de minimis*.

**401(K) Savings Plan**

49.     The Debtor sponsors a defined contribution plan, or 401(k) Plan, intended to qualify under § 401 of the Internal Revenue Code of 1986, as amended, (the "Code"), administered by Union Central/Ameritas.  Substantially all of the Debtors' Employees are eligible to participate in the 401(k) Plan on the first day of the month at least three months after beginning employment if they are over 21 years of age (the "401(k) Plan").  Employees may contribute up to $17,500.00 to invest among various pre-selected investment alternatives. Employee contributions to the 401(k) Plan vest immediately.  The Debtor provides a 100%

discretionary match one time per year during the first quarter of the year.  The match occurring in 2013 has already been paid.

50.     The Employees' contributions to the 401(k) Plan total approximately $6923.28 per Pay Period for Employees.  Currently, the Debtor estimates that there is approximately $-0- of accrued but unpaid prepetition liabilities pertaining to the Employees' contributions to the 401(k) Plan because Debtor's contributions are discretionary.  Of course, the Employees' contributions to the 401(k) Plan are not property of the bankruptcy estate, but constitute funds held in trust for the benefit of the Employees.  The Debtor requests to continue the 401(k) Plan for Employees, in its sole discretion, and in the ordinary course of business and to remit any prepetition amounts withheld thereunder.

## Miscellaneous Employee Benefits

(i)     **Employee Life, Accidental Death and Dismemberment Insurance, and Short and Long Term Disability Benefit Programs**

51.     The Debtor offers Salaried Employees with certain life insurance and accidental death and dismemberment coverage (collectively, the "Life Insurance").  All eligible Employees who elect health insurance are provided Life Insurance policy at no cost to the Employees through Humana Insurance.  Eligible Employees are also given the opportunity to purchase supplemental life insurance (the "Supplemental Life Insurance") coverage through Harford Life, with 100% of the cost funded by each participating Employee.  The average monthly cost of the Life Insurance policy paid by the Debtor is $1,993.65.  By the Employee Wages and Benefits Motion, the Debtor seeks the authority to honor all commitments on the Life Insurance policy in the ordinary course of business, including remitting any payments that remain outstanding as of the Commencement Date.

14

52.     The Debtor provides the option for all Employees who elect health insurance are eligible for short term disability.  The short term disability insurance is funded by the Employee and provides up to 60% of weekly earnings up to $600 per week following the 14 day elimination period.  Long term disability insurance is funded by the Debtor and provides up to 66 2/3% of wages up to $6,000 per month following the 26 week elimination period.  Employees are required to provide physician verification in order to receive Benefits.

53.     By this Motion, the Debtor requests the authority to maintain the short and long term disability programs and to continue to pay prepetition expenses related to the disability programs.  In relation to the overall payroll obligations of the Debtor and the negative impact withholding payment would have on the affected Employees, it is in the best interest of the company to maintain the disability insurance programs.

(ii)     Flexible Spending Account

54.     The Debtor provides its Employees with a flexible spending account, pursuant to which some Employees maintain flexible spending account plans for healthcare and dependent care (the "Flexible Spending Plan").  Under the Flexible Spending Plan, Employees have amounts withheld from their paychecks on a pre-tax basis and placed into personal accounts. The funds can subsequently be used by the Employees for their healthcare and dependent care expenses such as deductible amounts.

55.     The average monthly Employee contribution to the Flexible Spending Accounts is $3,769.04.  The Debtor requests the authority, but not the direction, to continue the Flexible Spending Plan in the ordinary course of business.

(iii)     Employee Discounts and Bonus Plans

56.     Hourly employees receive 50% off meals while on duty before shift or at break. Salaried management employees receive a free meal while on duty.  In addition, salaried

management employees receive a $75 voucher each month to treat their family to a meal. Alcohol is excluded.

57.    The Debtor provides certain managers bonuses based upon store sales and profits as a restaurant management bonus program.

58.    The Debtor asserts that failing to honor such programs would have an adverse affect on the Debtor's Employees far in excess of the cost of continuing such programs.  By this Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor to continue such programs in its sole discretion and make payments pursuant to such programs in the ordinary course of business, including amounts outstanding as of the Commencement Date.

(iv)    Educational Assistance Program

59.    The Debtor will reimburse up to $3,000 per year for educational assistance for classes pertaining to the business or as part of a degree so long as the student receives a "B" or better in the class (the "Educational Assistance Program").  Only two employees are currently enrolled in eligible classes creating a potential liability in the aggregate of $6,000 which may not accrue during the pendency of this case.

60.    By this Motion, the Debtor requests authority to honor, in its sole discretion, its Education Assistance Program in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.

## III.    ADMINISTRATIVE FUNCTIONS RELATED TO EMPLOYEE BENEFIT PLANS

61.    As is customary in most companies the size and complexity of the Debtor, the Debtor utilizes the services of several professionals and consultants in the ordinary course of its business in order to facilitate the administration and maintenance of its books and records related to certain of the Employee Benefits.  The Debtor utilizes the services of third-party

administrators ("TPA's"), including ADP and People Matter to manage its various Employee benefit programs, including but not limited to insurance, payroll processing, COBRA processing, the 401(k) Plan, and Employee Applications and Testing (the "Administration Expenses"). The amount the Debtor pays these professionals and consultants averages approximately $5,000 per month for ADP and $57,115 per month for People Matter.

62.     These administrative services are necessary to the Debtor's administration of Employee Benefit Plans and ensure that the Debtor's multiple benefit programs are operated in the most cost-effective and efficient manner. Accordingly, the Debtor requests that it be authorized, but not directed, to pay, in the ordinary course of business, the prepetition Administration Expenses owing to such TPAs.

63.     Finally, the Debtor seek an Order authorizing and directing all banks to receive, process, honor and pay any checks, direct deposits and or wire transfers drawn upon the Debtor's payroll and general disbursement accounts related to Employee Wages and Benefits, or Administration Expenses, whether presented before or after the Commencement Date, provided that such funds are on deposit in the applicable amounts to cover such payments.

**c)** **Emergency Motion of the Debtor in Possession for an Order (A) Authorizing the Continued Use of the Debtor's Centralized Cash Management System and (B) Authorizing Maintenance of the Debtor's Existing Checks, Bank Accounts, and Business Forms**

64.     By the above-referenced motion (the "Cash Management Motion"), the Debtor seeks entry of an order: (a) authorizing the continued use of the Debtor's existing centralized cash management system, (the "Cash Management System") and (b) authorizing maintenance of the Debtor's existing checks, bank accounts, and business forms. The Debtor seeks this authorization to insure its orderly entry into bankruptcy and to help efficiently administer its

business and avoid the disruptions and distractions that would inevitably divert the Debtor's attention from urgent matters during the initial stages of its bankruptcy case.

### (i)      The Cash Management System

65.      The Debtor maintains thirty-nine bank accounts (the "Bank Accounts") at seventeen financial institutions (the "Banks") in the ordinary course of business.  The Bank Accounts include, without limitation, depository accounts, payroll accounts, and accounts payable accounts.  A true and correct list of the Bank Accounts, including the Banks, each Bank's address and the last four digits of the account numbers is attached to the Cash Management Motion as Exhibit A.

66.      The Cash Management System provides well-established mechanisms for the collection, distribution, and management of funds used in the Debtor's business.  The flow of cash begins with cash generated at the various restaurants.

67.      The Debtor's cash management reporting and accounting functions are systematic and include the necessary accounting controls to enable the Debtor to trace funds.  The Debtor maintains necessary records for its Cash Management System that identify the current balance of its Bank Accounts.  The Debtor will also be able to determine the amount of funds deposited into or withdrawn from the Bank Account by the Debtor and will track the expenses that are satisfied.

68.      Accordingly, I believe the ability to maintain the current Cash Management System is necessary to avoid disruption of the ongoing business operations and the relief as requested in the Cash Management Motion should be granted.

### (ii)      Existing Bank Accounts, and Business Forms

69.      The Debtor's business forms, letterhead and checks are all customized according to its ordinary business needs.  Because of the expense and disruption that would be incurred by the formulation of new forms containing the designation "Debtor in Possession," I believe it is in

18

the best interest of the estate for the Debtor to continue to use its customized forms, and letterhead during the course of this chapter 11 case without placing the label "Debtor in Possession" on each separate check or form.

70.     In addition, the Debtor seeks a waiver of the requirement that new bank accounts be opened to replace all of the Debtor's existing Bank Accounts because such a requirement would unnecessarily disrupt the Debtor's business, impair its efforts to reorganize successfully and not provide any significant benefit to the Debtor's estate, its creditors or other parties in interest.  I believe it is critical to the continued operation of the Debtor's business and the preservation of the value of its assets that the existing cash management system and Bank Accounts continue to be utilized without disruption.

71.     In the ordinary course of business, the Debtor uses many pre-printed correspondence and business forms.  I believe the nature and scope of the Debtor's business and the numerous suppliers of goods and services require that the Debtor be permitted to continue using its existing pre-printed correspondence and business forms without alteration or modification.  Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's business operations.  I believe parties doing business with the Debtor will undoubtedly be aware of the Debtor's status as Debtor in possession.

72.     Furthermore, the filing of the Debtor's bankruptcy petitions will undoubtedly be publicized within the business community, which I believe will place a strain on the Debtor's relationships with its customers, vendors and other creditors that are essential to its continued operations.  If the Debtor is required to substitute new debtor in possession bank accounts for its existing Bank Accounts, these relationships will be further strained by the payment delays and

confusion that would result from opening the new accounts.  Consequently, I believe that it is imperative that the Debtor be permitted to continue using the existing Bank Accounts to avoid such unnecessary disruption of its business, efficiently administer its bankruptcy case and devote its efforts to a successful reorganization.  Although the Debtor seeks authorization to utilize and retain its existing checks and bank accounts, the Debtor will maintain its books and records so as to provide a clear line of demarcation between prepetition and post-petition transactions and operations.  The Debtor further represents that if the proposed relief is granted, it will not pay, and each of the Banks will be directed not to pay, any debts incurred before the Commencement Date, other than as authorized by this Court.

**d) Motion of the Debtor for Entry of an Order Under 11 U.S.C. §§ 105(A) and 366 (I) Preventing Utility Companies From Discontinuing, Altering, Refusing Service, (II) Establishing Procedures for Determining Adequate Assurances of Payment, and (III) Establishing Procedures for the Utility Companies to Opt Out of the Debtor's Proposed Procedures for Adequate Assurance**

73.     By the above referenced motion (the "Utilities Motion"), the Debtor seeks entry of an order  (a) determining that its Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed procedures for Utility Providers to request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to seek to opt out of the Debtor's proposed adequate assurance procedures; and (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by the Utilities Motion, pending entry of a final order approving same.

74.     In connection with the operation of its business and the management of its properties, the Debtor purchases utility services (collectively, the "Utility Services") from various providers (collectively, the "Utility Companies").  Attached as <u>Exhibit A</u> to the Utilities Motion is a nonexclusive list of substantially all of the Utility Companies that were providing Utility Services to the Debtor as of the Commencement Date.[3]

75.     I believe that if the Utility Companies are permitted to terminate Utility Services on the thirty-first day after the Commencement Date, there will be severe disruptions in the Debtor's business affairs.  Further, to avert such harm, the Debtor would be required to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of necessary Utility Services.

76.     If Utility Services to the Debtor's restaurants, and administrative facilities were interrupted, the Debtor would no longer be able to operate its business, could be in violation of its lease terms, and could suffer irreparable harm.  Any loss of Utility Services could result in the loss of significant sales and resulting irreparable harm to the Debtor's relationships with its customers, and the loss of goodwill in the marketplace.  Simply put, without the Utility Services, the Debtor's operations will shut down.

77.     The Debtor fully intends to pay all post-petition obligations owed to the Utility Providers in a timely manner.  Further, the Debtor expects that available cash collateral will be more than sufficient to pay all postpetition utility obligations.

78.     Nevertheless, the Debtor proposes to provide adequate assurance to the Utility Providers by making a deposit equal to two weeks of utility service, calculated as a historical

---

[3] Although the Debtor has exercised its best efforts to list all of the Utility Companies on <u>Exhibit A</u> to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from such exhibit. Accordingly, the Debtor requests that any relief granted pursuant to this Utilities Motion apply to any Utility

average during the most recent calendar year, to each Utility Provider as interim adequate assurance (the "Adequate Assurance Deposit") within seven business days of the first day hearing (the "First Day Hearing"), provided that such Utility Provider is not currently paid in advance for its services.

79.    I believe that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

80.    In light of the severe consequences to the Debtor of any interruption in Utility Services, but recognizing the right of Utility Providers to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtor is proposing procedures in the Utilities Motion that will enable the Debtor to cooperatively work with the Utility Providers in a coordinated manner to consensually resolve adequate assurance issues.  If the Debtor and a Utility Provider cannot consensually resolve such issues, I am informed by counsel that the Court should determine first whether an additional adequate assurance payment is necessary and, if so, how much it should be so that the Utility Provider will not cease performance for failure of adequate assurance.  The procedures that the Debtor proposes to effectuate this result are set forth in detail in the Utilities Motion (the "Adequate Assurance Procedures").  I believe it is prudent to require Utility Providers to raise any objections to the Adequate Assurance Procedures so that such objections may be heard by the Court before the running of the 30-day period following the Petition Date in order to avoid a potential hostage situation.

---

Company that provides Utility Services to the Debtor, whether or not any such Utility Company is identified on Exhibit A to the Utilities Motion.

81.    Lastly, the Debtor has made an extensive and good faith effort to identify its Utility Providers and include them on the Utility Service List.  Nonetheless, it is possible that the Debtor has not yet identified or included certain Utility Providers on the Utility Service List.  To the extent that the Debtor identifies additional Utility Providers, the Debtor will file amendments to the Utility Service List, and shall serve copies of the Order on such newly identified Utility Providers.  The Debtor requesst that the order be binding on all Utility Providers, regardless of when such Utility Provider was added to the Utility Service List.

82.    Based on the foregoing reasons, I believe and submit that an order granting the relief requested in the Utilities Motions is in the best interest of the Debtor, its estate, its creditors and other parties in interest.

**e)    Motion Of The Debtor For An Order Pursuant To Bankruptcy Code Sections 105, 363, 364, 1107 And 1108, And Bankruptcy Rule 6003 Authorizing The Debtor To Maintain Insurance Policies, Pay Insurance Obligations, And Renew Insurance Policies**

83.    By the above-captioned Motion (the "Insurance Motion"), the Debtor seeks entry of an order authorizing, but not directing, the Debtor to:  (a) maintain its various insurance policies (collectively, the "Insurance Policies") and to pay all premiums, brokers' fees, administration fees, and consulting fees, (the "Insurance Obligations"), arising under or in connection with the Insurance Policies which the Debtor has obtained through several third-party insurance carriers (collectively, the "Insurance Carriers"), including any Insurance Obligations for prepetition periods, and (b) enter into new insurance policies, as the Debtor, in its discretion, deems necessary and appropriate to ensure adequate insurance coverage.

**A.    Insurance Policies and Obligations**

84.    In connection with the operation of its business and management of its retail restaurants, the Debtor maintains numerous Insurance Policies.  The Insurance Policies include

coverage for, among other things, property liability, general liability, automobile liability, umbrella liability, excess umbrella liability, workers' compensation, trade name restoration, directors' and officers' liability, employment practices liability, fiduciary liability, and other miscellaneous coverage. A list of insurance policies is attached to the Insurance Motion as Exhibit A. I believe the third-party claims that are covered by the Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtor.

85. To the extent that any Insurance Policy premiums or losses paid on Debtor's behalf and billed to Debtor may be attributed to prepetition insurance coverage, I believe that payment of such Insurance Policy premiums is necessary to ensure continued coverage under such Insurance Policies and to maintain good relationships with the Debtor's insurers.[4] Similarly, I believe that continued payment of Insurance Policy premiums as such premiums come due in the ordinary course of the Debtor's business is necessary. The Debtor's maintenance of its relationships with its insurers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage.

86. Certain of the insurance policies require that the Debtor pays a deductible or a self-insured retention payment in connection with individual claim occurrences. Accordingly, the Debtor intends to continue making such payments on account of post-petition losses, if any, to the extent the Debtor determines such payments are necessary to avoid impairment to the coverage, benefits, or proceeds provided under the insurance programs.

87. As of the Commencement Date, the Debtor does not believe there are any outstanding premiums in connection with the Insurance Policies. As described herein,

continuation of the insurance coverage and insurance policies is essential to the ongoing operations of the Debtor's business. Accordingly, the Debtor intends to maintain appropriate levels of insurance with respect to the aforementioned categories of insurance policies at all times and I believe approval of the Insurance Motion is in the best interest of the Debtor, its estate, and parties-in-interest.

### f) Debtor's Emergency Motion for Authority to Honor Credit-Card Chargebacks, Discounts and Commissions

88.      By the above-captioned "Credit Card Motion", the Debtor seeks entry of an Order authorizing it to continue to honor certain credit-card transactions, chargebacks, discounts, commissions and related expenses.

89.      In the normal course of business, a significant portion of the Debtor's customers pay for their purchases with credit cards. During the post-petition period, the Debtor expects to continue accepting credit cards as payment for purchases in the normal course of its day-to-day operations. The Debtor has entered into agreements with Bank of America Merchant Services governing the terms and conditions of credit card payments, discounts, and commissions, as more specifically described herein (the "Agreements").

90.      The Credit Card Processor provides the Debtor with processing service for all credit cards accepted by the Debtor, including VISA, Mastercard, Discover, and American Express. Pursuant to the Agreements, subject to certain fees, commissions, and other costs of administration in processing credit card transactions, the Debtor is permitted to accept the credit cards at all of its restaurants.

---

[4] The Debtor believes that it is current on all insurance premium obligations. Nonetheless, out of an abundance of caution, the Debtor seeks express authority to make payments for any insurance premium obligations that may be attributed to prepetition insurance coverage.

91.    I believe that honoring credit card charges and the commensurate expense associated therewith, in the ordinary course of the operation of the Debtor's business, is entirely appropriate, in fact necessary, in the retail context.  Furthermore, I have been informed by counsel that under section 553 of the Bankruptcy Code, the credit card companies are likely to seek setoff of all such charges against funds in their possession that they would otherwise remit to the Debtor.

92.    I further believe that any delay in implementing the relief requested herein will cause the credit card companies to refuse to do business with the Debtor, which will have a significant and material adverse affect on the Debtor's sales figures, and would likely result in substantial customer attrition and a corresponding decline in the value of the Debtor's estate. More than 80% of the Debtor's total sales in its restaurants reflect credit card transactions.

**g)  Motion of the Debtor in Possession for an Order Authorizing the Debtor to Pay Prepetition Sales, Franchise and Use Taxes Pursuant to Section 105(a) of the Bankruptcy Code**

93.    Under the above-referenced motion (the "Tax Motion"), the Debtor seeks entry of an order pursuant to section 105 of the Bankruptcy Code that authorizes, but does not direct, the Debtor to pay undisputed prepetition sales, use and franchise tax obligations owed to the appropriate taxing authorities (the "Taxing Authorities") in the ordinary course of business, on an unaccelerated basis, as payments become due and payable.  To the extent that a check issued prior to the Commencement Date has not cleared the bank as of the Commencement Date, the Debtor also seeks entry of a order (i) authorizing the Debtor's banks to honor such checks and/or any prepetition wire transfer requests and (ii) authorizing the Debtor to issue replacement checks, submit replacement fund transfer requests or provide other means of payment to the Taxing Authorities to the extent necessary to pay all undisputed prepetition sales, use and franchise tax obligations.

26

94.     In connection with the normal operation of business, the Debtor incurs franchise and other taxes and fees and collect sales and use taxes from its customers and other third parties (collectively, the "Taxes") on behalf of various taxing authorities for payment to such authorities. The Debtor pays the Taxes to the various Taxing Authorities on a monthly, quarterly or yearly basis, depending on the particular Tax, as such payments become due and payable.

95.     On a periodic basis, the Debtor pays to the Taxing Authorities all sales and use taxes by funds drawn by check or by means of an electronic funds transfer.

96.     As of the Commencement Date, the Debtor's financial records indicate that the Debtor is substantially current on its payment of Taxes to all Taxing Authorities.  Any amounts know to be due are attached as Exhibit A to the Tax Motion.  Therefore, the Debtor seeks this relief out of an abundance of caution and to the extent that any Taxes accrued prepetition were not paid prepetition, paid in an amount that is less than actually owed, or if any payments sought to be made prepetition are rejected, lost or otherwise not received in full by any Taxing Authority.

97.     I believe that the failure to pay the Taxes could have a material adverse impact on the Debtor's ability to operate in the ordinary course of business and could result in the Debtor's officers and directors being held personally and/or criminally liable for the failure to pay the Taxes.  Furthermore, the Debtor believes that the Taxing Authorities may cause the Debtor to be audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtor's attention from its business operations and reorganization.  The payment of the Taxes is also necessary to avoid potential administrative difficulties.  Withholding of payment of the Taxes will likely cause the Taxing Authorities to take immediate action, including an increase in state

audits and lien filings or motions for relief from stay. Prompt and regular payment of the Taxes will help avoid these unnecessary government actions.

98.    In addition, I am informed by counsel that the Taxes may be afforded priority status under section 507(a)(8) of the Bankruptcy Code, and therefore, such taxes and fees must be paid in full as a condition to confirmation of any plan of reorganization. Accordingly, the payment of the taxes and fees affects the timing of the payment and should not prejudice the rights of other creditors or reduce the ultimate distribution to such creditors. Further, to the extent that the Debtor has collected sales and use taxes from its customers and such funds must be held in trust by the Debtor for the benefit of the Taxing Authorities, such monies may not constitute property of the Debtor's estate.

99.    Accordingly, I respectfully submit that the payment of the taxes and fees is necessary for the continued operation of the Debtor's business.

### h) **Motion of the Debtor in Possession for an Order Establishing Certain Special Notice Procedures and Master Service List Pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure**

100.    Under the above-referenced motion (the "Notice Procedures Motion"), the Debtor seeks an administrative order of this Court establishing certain special notice procedures and a master service list pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

101.    I believe the relief requested by the Notice Procedures Motion is necessary to ensure the efficient administration of this chapter 11 case while ensuring that all parties with significant interests in these proceedings have an opportunity to be heard.

102.    The Notice Procedures motion proposes establishing a Master Service List (as defined in the Notice Procedures Motion) that would limit the service of most filings in this case upon a core list of parties in interest and provide authorization for electronic service.

103.    I believe that, for several reasons, it is necessary and appropriate to adopt the procedures proposed in the Notice Procedures Motion.  First, providing notice of all matters in this case to all of the parties who would otherwise be entitled to notice would actually delay the provision of notices and would be unjustifiably burdensome and uneconomical.  It would also place an enormous administrative burden on the Debtor's estate and would impede the consummation of transactions, negotiation of settlements and the granting of other relief that may be advantageous to the estate and its creditors.  Furthermore, providing notice of all matters to all of the entities otherwise entitled to notice of such matters would unnecessarily increase the costs of administering this case and, in many instances, delay service to these institutions.

104.    Based on the above, I believe that the proposed notice procedures will mitigate the administrative burden that would otherwise be imposed upon the Debtor's estate without diminishing creditor participation.

### i) **Motion of Debtor in Possession for an Order Authorizing the Retention and Employment of Garden City Group as Claims, Noticing, Balloting and Disbursing Agent**

105.    By the above-captioned motion (the "Garden City Motion"), the Debtor seeks authorization to employ Garden City Group ("Garden City") as its claims, noticing, balloting and disbursing agent (the "Agent") in connection with the Debtor's chapter 11 case pursuant to the terms and conditions of the Garden City Agreement for Services (the "Garden City Agreement"), a copy of which is annexed to the Garden City Motion as Exhibit A.  The Debtor proposes to retain Garden City on the terms and conditions set forth in the Garden City Agreement, with the cost of such services to be paid from the Debtor's estate as contemplated by 28 U.S.C. §156(c).

106.    The Debtor has over 400 creditors and potential creditors and numerous other parties-in-interest in this chapter 11 case.  Due to the large quantity of creditors that the Debtor has, I have been informed by counsel that it would be impracticable for the Office of the Clerk of

the United States Bankruptcy Court for the Southern Eastern District of Kentucky, Lexington Division (the "Clerk's Office") to undertake such tasks. Hence, I submit that the engagement of an independent third party to act as agent for the Court is the most effective and efficient manner by which to perform certain tasks, including, but not limited to: (i) providing administrative services and consultation regarding claims management and solicitation; (ii) overseeing the distribution of solicitation materials; (iii) receiving, reviewing and tabulating ballots; and (iv) providing computer software support and database management; and (v) performing other administrative tasks such as maintaining creditor lists and mailing notices.

107.   I believe Garden City is well suited to provide these services because Garden City is a data-processing firm whose principals and senior staff have in-depth experience in performing noticing, plan balloting, distribution services, and other administrative tasks for chapter 11 debtors. As set forth in the affidavit of Emily S. Gottlieb (the "Gottlieb Affidavit"), attached to the Garden City Motion as Exhibit B, Garden City has assisted and advised numerous chapter 11 debtors in connection with noticing, administration of plan votes and other administrative functions related to bankruptcy proceedings and plans of reorganization.

108.   The compensation to be provided by the Debtor to Garden City for services rendered is set forth in the fee schedule provided to the Debtor as part of the Garden City Agreement and is subject to adjustment by Garden City at the beginning of each calendar year. The Debtor believes that such compensation is fair and reasonable. A copy of the fee schedule shall be provided to the U.S. Trustee.

109.   Accordingly, I believe that the retention of Garden City is essential to the operating efficiency of this chapter 11 case. I further submit that if Garden City is not engaged,

then the Debtor may have to divert substantial resources from its reorganization efforts to administrative tasks related to this case.

**j)  Application Pursuant to Fed. R. Bankr. P. 2014(a) For An Interim and Final Order Under Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Dinsmore & Shohl As Counsel For the Debtor in Possession**

110.    By the above referenced "Dinsmore Application", the Debtor seeks to employ and retain the firm of Dinsmore & Shohl LLP ("D&S" or the "Firm") as its counsel with regard to the filing and prosecution of this chapter 11 case and all related matters, effective as of the Commencement Date.    Accordingly, the Debtor respectfully requests entry of an order authorizing it to employ and retain the Firm as its general bankruptcy counsel under a general renewing retainer to perform the legal services that will be necessary during this chapter 11 case.

111.    D&S is well qualified to represent the Debtor.  In preparing for this case, D&S has become familiar with the Debtor's business affairs and many of the potential legal issues that may arise in connection with these this 11 case.  D&S also has knowledge of the Debtor's business, financial affairs and capital structure.  In selecting D&S as its general bankruptcy counsel, the Debtor considered D&S's intimate knowledge of the Debtor's operations and finances and its expertise and experience in reorganization and bankruptcy law.  I understand that D&S has served as counsel to debtors and creditors in various bankruptcy cases.  In addition, the D&S attorneys responsible for representing the Debtor in matters related to its reorganization are members of D&S's restructuring, reorganization and bankruptcy department, with substantial experience in a wide range of bankruptcy cases.

112.    The Firm's depth of experience in business reorganizations and its familiarity with the Debtor makes D&S uniquely qualified to deal effectively with the legal issues that may arise in the context of the Debtor's reorganization.  Therefore, the Debtor believes that D&S is well

qualified to serve as its bankruptcy counsel and that retention of D&S is in the best interest of the estate.

113.    I believe the Firm's services are necessary to enable and assist the Debtor in performing its duties as Debtor-in-Possession relating to the day-to-day operations of the company as well as all bankruptcy specific matters.

114.    Accordingly, I respectfully submit that authorizing the Debtor to employ and retain D&S as attorneys for the Debtor in these chapter 11 proceedings is necessary and in the best interest of the Debtor and its estate.

### k)    Application For an Interim and Final Order Authorizing the Employment and Retention of Mastodon Ventures, Inc.. As Financial Advisors to the Debtor-in-Possession Pursuant to Section 327(a) of the Bankruptcy Code

115.    By the above referenced "Mastodon Application", the Debtor seeks to employ and retain Mastodon Ventures, Inc. ("Mastodon") to perform the services necessary to the successful administration of this chapter 11 case, as Financial Advisors.

116.    The Debtor has selected Mastodon because of Mastodon's experience in matters of this character and its exemplary qualifications to perform services required in this case.  I believe the retention and employment of Mastodon is in the best interests of creditors and the best interests of the estate.

117.    Mastodon is well qualified to serve as Financial Advisor to the Debtor.  Mastodon specializes in assisting and advising debtors, creditors, investors, and court-appointed officials in bankruptcy proceedings and out-of-court workouts.  Its services have included assistance in developing/analyzing and evaluating, negotiating, and confirming plans of reorganization and testifying regarding debt restructuring, feasibility, and other relevant issues.  It is my understanding that Mastodon has been retained in numerous bankruptcy proceedings of similar size and scope of this chapter 11 case.

118.    All the services that Mastodon will provide to the Debtor will be: (i) at the request of the Debtor, (ii) appropriately directed by the Debtor so as to avoid duplicative efforts among the professionals retained in the case, and (iii) performed in accordance with applicable standards of the accounting profession.

119.    Accordingly, I respectfully submit that authorizing the Debtor to employ and retain Mastodon as financial advisor for the Debtor in these chapter 11 proceedings is necessary and in the best interest of the Debtor and its estate.

**l)    Emergency Motion Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 2002-1 and 4001-1 for Interim and Final Orders (I) Authorizing Incurrence by the Debtor of Post-Petition Secured Indebtedness with Priority over all other Secured Indebtedness and with Superpriority, (II) Granting Liens, (III) Authorizing Use of Cash Collateral by the Debtor and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing**

120.    Pursuant to the above-referenced "DIP Financing Motion", the Debtor seeks the authority to (i) obtain cash advances and other extensions of credit on a senior secured, revolving basis, in an initial aggregate principal amount not to exceed $1,000,000.00 (the "Senior DIP Credit Facility") pursuant to the certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "Senior DIP Credit Agreement" and together with any and all documents, agreements and instruments delivered pursuant thereto, or as may be amended form time to time, the "Senior DIP Financing Agreements") between Debtor and RMH Illinois LLC (the "Senior DIP Lender"); (ii) obtain cash advances and other extensions of credit on a senior superpriority basis, subordinated only to the Senior DIP Credit Facility, on revolving basis, in an initial principal amount of $500,000.00 (the "Subordinated DIP Credit Facility", and together with the Senior DIP Facility, the "DIP Facilities") pursuant to the certain Subordinated Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "Subordinated DIP Credit Agreement", and

together with any and all documents, agreements and instruments delivered pursuant thereto, or as may be amended form time to time, the "Subordinated DIP Financing Agreements") between Debtor and Curtis James Investments (the "Subordinated DIP Lender", and together with the Senior DIP Lender, the "DIP Lenders"); (iii) granting security interests and superpriority claims, and (iv) granting adequate protection, pursuant to sections 105, 361, 362, 363, 364(c), (d) and (e) of the Bankruptcy Code, and Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Local Rules 2001-2 and 4001-2 pursuant to the terms and conditions set forth in the attached proposed Interim Order.

121.    After consulting with legal counsel and financial advisors, I believe that, under the current circumstances, the post-petition financing proposal made by the DIP Lenders most clearly satisfies the Debtor's financing needs and establishes necessary support at the outset of this case to permit the Debtor time to seek to maximize the value of the estates ongoing business operations for benefit of all creditors.

122.    Before deciding to enter into the DIP Credit Agreements, the Debtor and the DIP Lenders engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law.  I believe that based on the totality of the circumstances, the Debtor was unable to obtain proposals for post petition financing on terms and conditions more favorable to the Debtor's estate than those set forth in the DIP Credit Agreements.

123.    I believe that unless the Debtor is authorized to obtain the financing requested herein, the Debtor faces significant risks that its primary inventory vendors will no longer do business with the Debtor, employees will have added concern with respect to their job security, and customers may eat at other restaurants.  Additionally, the additional liquidity will allow the

Debtor to maintain ordinary and consistent inventory levels moving forward. Ultimately, I believe the DIP Credit Facilities will provide necessary comfort of the Debtor's ability to maintain business relationships with vendors, suppliers, and customers, to pay its employees, and to otherwise fund its operations, which is essential to the Debtor's continued viability and preservation and maintenance of the going concern value of the Debtor's business.

124. I believe the Debtor is unable to obtain credit that is not both secured and entitled to what counsel has explained to me as superpriority administrative claim status under the Bankruptcy Code from any other financing source. The Debtor's obligations under the Pre-Petition Credit Facility are secured by the Debtor's assets. Under these circumstances, and given the Debtor's current financial status, I believe that no lender would provide financing to the Debtor other than on a secured and superpriority basis. The Debtor made efforts to negotiate alternative debtor in possession financing arrangements with the Senior DIP Lender, and with other entities that are known to provide debtor-in-possession financing (both traditional and non-traditional). No lender offered financing on terms that, taken as a whole, were better than those provided under the DIP Credit Agreements. I have been informed by counsel that this satisfies the conditions for 364(c) of the Bankruptcy Code. Thus, I believe that the financing arrangement proposed under the DIP Credit Agreements represents the best available to the Debtor at this time.

125. I believe and understand that the terms of the DIP Credit Agreements and Interim Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtors in possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Credit Agreements and the Interim

Order have been negotiated in good faith and at arms' length by and among the Debtor and the DIP Lenders, with all parties represented by counsel. Accordingly, the Debtor believes that any credit extended under the terms of the Interim Order is extended in good faith by the DIP Lenders as that term is used in section 364(e) of the Bankruptcy Code.

126.    I believe that given the Debtor's current financial status, the Debtor is unable to obtain credit that is not secured with a priming lien above that of the Pre-Petition Lender. After appropriate investigation and analysis, I have concluded that the DIP Credit Agreements are the best alternative available under the circumstances.

127.    I believe that the Debtor's inability to utilize the funds made available pursuant to the DIP Credit Agreements will immediately create substantial issues with Debtor's ability to provide the restaurants with adequate inventory, create customer dissatisfaction and, ultimately could cause the cessation of its operations and result in a complete liquidation of all restaurants, which will have far reaching negative ramifications including the dismissal of the Debtor's approximately 1,800 remaining employees. Additionally, I believe this would result in the value of the Debtor's going concern operations plummeting overnight. Accordingly, I believe the only way to protect the value of the Pre-Petition Collateral to the fullest extent possible is for the Debtor to obtain the debtor in possession financing provided by the DIP Credit Facilities.

128.    Therefore, I believe that it is in the exercise of the respective best and reasonable business judgment of the Debtor, that the financing to be provided by the DIP Lenders is the most favorable funding available under the circumstances and addresses the Debtor's immediate necessary financing needs while they reorganize its business. I believe that the financing available under the DIP Credit Agreements will enable the Debtor, among other things, to maintain good relationships with the majority of its vendors, provide added confidence to

employees and customers and avoid the cessation of its ongoing operations, and maximize the value of its business as a going concern.

### III.    <u>CONCLUSION</u>

129.    In order to preserve and maximize the value of its business and successfully reorganize, the Debtor's immediate goal is to engage in business as usual following the commencement of this chapter 11 case.  I believe that, if the Court grants the relief requested in each respective First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtor's estate, its creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 22nd day of April, 2013.

*/s/ W. Curtis Smith*
W. Curtis Smith
Managing Member, AppleILLINOIS, L.L.C.

492085v3